**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, et al., Plaintiffs,**

v.

**LORAL CORPORATION, et al., Defendants.**

**No. 5:92 CV 2391.**

United States District Court, N.D. Ohio, Eastern Division.

April 20, 1994.

**58**

See also 873 F.Supp. 66.

Betty E. Grdina, Bobulsky & Grdina, Ashtabula, OH, for plaintiffs.

Edward C. Kaminski, Buckingham, Doolittle & Burroughs, Akron, OH, Carol MacKenzie, Alan Pearl, Pearl & MacKenzie, Westbury, L.I., NY, for defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court are three motions for summary judgment: 1) plaintiffs' motion (Docket No. 46); 2) defendant Loral Corporation's motion (Docket No. 61); and 3) the combined motion of defendants Aircraft Braking System Corporation and K & F Industries (Docket No. 62). Supporting and opposing memorandums have been filed for each motion. For the reasons discussed below, each motion is granted in part and denied in part.

### I. PROCEDURAL BACKGROUND

On November 10, 1992, the above-captioned action was filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Local 856 (collectively, "the Union") and five individuals each on their own behalf and on behalf of others similarly situated.[1]

The complaint, as amended, set forth ten counts, including two breach of contract and two breach of ERISA plan claims against Loral Corporation ("Loral"); two breach of contract and two breach of ERISA plan claims against Aircraft Braking Systems Corporation ("ABSC"); one claim for a declaratory judgment that Loral and ABSC (or K & F Industries ["K & F"] ) are alter egos and jointly liable; and one claim for promissory estoppel asserted by two of the plaintiff classes against Loral and ABSC.

The individual plaintiffs subsequently moved for class certification. In addition, ABSC and K & F moved for dismissal of the counts against them and Loral moved for judgment on the pleadings.

---

**1.** The five individuals are Francis Coen, George Hudak, David Sciulli, John Neidert and John M. Sprouse.

In a Memorandum Opinion and Judgment Entry dated July 16, 1993, *See* Docket Nos. 35 and 36, this Court ruled on the motions, certifying the Coen Class[2] and the Hudak Class[3] and narrowing the claims to the following:

—Count I: Section 301 LMRA[4] breach of contract claim by the Union and the Coen Class against Loral;

—Count II: Section 301 LMRA breach of contract claim by the Union and the Hudak Class against ABSC;

—Count V: ERISA breach of plan terms claim by the Coen Class against Loral;

—Count VII: ERISA breach of plan terms claim by the Hudak Class against ABSC;

—Count IX: Section 301 LMRA claim by the Hudak Class for declaratory judgment that ABSC and K & F are jointly and severally liable, that is, alter egos;

—Count X: Promissory estoppel claims of Coen and Hudak, as individuals, against Loral and ABSC.

All remaining parties and claims were dismissed.[5]

## II. FACTUAL BACKGROUND

For purposes of these summary judgment motions, the factual background is uncomplicated and undisputed.

Plaintiff UAW Local 856 and Goodyear Aerospace Corporation ("GAC"), a subsidiary of the Goodyear Tire & Rubber Co: ("Goodyear Tire"), were parties to a series of collective bargaining agreements ("CBA"), which covered employee wages, hours and working conditions. They were also parties to a Pension, Insurance and Service Award Agreement ("PISA").[6] These two documents were historically negotiated simultaneously, had identical durations and were effective for concurrent terms.

On March 13, 1987, Goodyear Tire sold the assets of GAC to Loral. Loral assumed the existing 1985 CBA/PISA, including the insurance obligation for employees retiring after the sale date.[7] Upon the expiration of the 1985 CBA on August 10, 1988, the Union engaged in a strike which concluded on October 31, 1988 when the parties reached an agreement on the 1988 CBA/PISA. The 1988 CBA expired on August 10, 1991.

After the assets purchase, Loral maintained the two divisions of the GAC operation: the Defense Systems Division and the Aircraft Braking Division.[8] On April 27, 1989, the Aircraft Braking Division was sold to K & F, which formed ABSC as a wholly

---

**2.** The Coen Class consists of the retired hourly employees of Loral who retired on or before October 14, 1991 and their spouses and the surviving spouses of such retired employees now deceased and all other eligible participants and beneficiaries. Docket No. 35, p. 23.

**3.** In the Memorandum Opinion certifying the Coen and Hudak classes, the Court, quoting from paragraph 30 of the amended complaint, identified the Hudak Class as "retired hourly employees of [ABSC] who retired on or before August 10, 1991 and their spouses and the surviving spouses of such retired employees now deceased and all other eligible participants and beneficiaries." Docket No. 35, p. 23. However, since ABSC only assumed insurance obligations for employees who retired after April 17, 1989, the date that K & F bought Loral's Aircraft Braking Division, it appears that the description of this class needs to be limited to "retired hourly employees of ABSC who retired between April 17, 1989 and August 10, 1991, inclusive, and their surviving spouses...."

**4.** Labor Management Relations Act, 29 U.S.C. § 141, *et seq.*

**5.** Counts III, IV, VI, and VIII were completely dismissed; Counts V and VII were dismissed to

the extent that they asserted claims of breach of fiduciary duty under ERISA; Count IX was dismissed to the extent that it sought a declaration of alter ego vis-a-vis Loral and ABSC; and Count X was dismissed to the extent that it sought to assert a claim of promissory estoppel on behalf of the Coen and Hudak *classes*. The dismissal of Count X as to the purported classes was without prejudice to the right of any individual who might have been a member of one of the classes to pursue his or her own rights in a separate lawsuit. In addition, three of the individual plaintiffs (Sciulli, Neidert, and Sprouse) were dismissed, with the Court declining certification of those three classes.

**6.** For convenience, hereafter these two documents will be referred to as if they were a single document: "the *(year)* CBA/PISA."

**7.** Goodyear Tire retained the insurance obligation for employees who had already retired as of the sale date.

**8.** K & F and ABSC refer to this division as "the Wheel and Brake Division."

owned subsidiary. ABSC adopted the 1988 CBA/PISA, including the insurance obligation for employees retiring after the sale date. Loral retained the insurance obligation for employees who had already retired as of the sale date.

As the August 10, 1991 expiration date of the 1988 CBA/PISA approached, both Loral and ABSC negotiated with the Local Union. Negotiations were unsuccessful. On August 10, 1991, ABSC implemented its final offer and work continued. Loral and the Local Union, however, agreed to extend the 1988 CBA/PISA to October 14, 1991. Negotiations were still unsuccessful, so on that date, Loral also implemented its final offer.[9] The final offers of both ABSC and Loral contained changes to the medical benefits of the active hourly employees.

In June of 1992, the changes were applied by ABSC to employees who had retired before August 10, 1991 and by Loral to employees who had retired prior to October 14, 1991.[10]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *See, e.g. U.S. v. Hodges X–Ray, Inc.*, 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2553, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mutual Life Assurance Co. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 1608 n. 17, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts ... earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)).

---

9. To date, no new CBA/PISA has been negotiated and the Local Union is still working under the final offers of Loral and ABSC.

10. The complaint also alleges that, on March 31, 1993, K & F announced that it would again

reduce health benefits for employees retiring after July 1, 1993, effective on July 1, 1993. (Complaint, ¶ 58). This fact has not been raised in any of the summary judgment motions.

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. at 2553 (equating the standard for a directed verdict under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*) and *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). "'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511.

## IV. DISCUSSION

### A. The Parties' Positions

Both Loral and ABSC contend that their medical benefits plans, which are ERISA welfare benefits plans, did not provide automatically vested benefits.

They further allege that GAC plan documents, including the Summary Plan Descriptions and contracts with the Plan administrator, have always reserved the right to modify or terminate retiree benefits. Part of the 1988 PISA was a Letter of Agreement which bound all parties to past interpretations of the PISA.[11] Loral and ABSC assert that each CBA/PISA lasted only three years and all benefits always expired on the date of expiration of the relevant CBA/PISA. Because negotiations for a new contract never included negotiations on behalf of already-retired workers, the benefits of retirees were always changed unilaterally; typically, the retirees' benefits were changed to match the negotiated benefits of active workers. Loral and ABSC argue that this past practice, adopted by virtue of Letter # 13, controls.

Finally, Loral and ABSC assert that even if the plan documents do not control, the 1988 PISA also shows no intent to confer lifetime medical benefits on retirees.

Plaintiffs take the position that the 1988 PISA is the only controlling document and that it provides lifetime medical benefits for those employees who retired under its terms. They argue that the benefits for retirees did not expire when the CBA/PISA expired.[12] Plaintiffs assert that neither the Summary Plan Descriptions nor any contract with a Plan administrator has any relevance to the issue of retiree benefits because neither is a negotiated document and, thus, cannot supersede the negotiated CBA/PISA.

---

11. In the 1988 PISA, this was Letter # 13, a copy of which is found at Docket No. 63, Exhibit D, p. 207. In the 1985 PISA, Letter # 15 stated essentially the same understanding. A copy of this letter is found at Docket No. 63, Exhibit B, p. 174.

12. There appears to be no question that the companies and the Union were free to negotiate changed benefits for employees who were still active, as opposed to retired, at the time of the expiration of a particular CBA/PISA.

### B. Analysis

#### 1. Counts I and II—Breach of CBA/PISA

█ In determining whether retiree insurance benefits continue beyond the expiration of a contract, the Court must look to the intent of the parties. *International Union, United Auto., Aerospace, & Agr. Implement Workers of America v. Yard–Man, Inc.,* 716 F.2d 1476, 1479 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). The *Yard–Man* Court stated that "[t]he parties may ... provide retiree insurance benefits which survive the expiration of the collective bargaining agreement. Any such surviving benefit must necessarily find its genesis in the collective bargaining agreement." *Id.* (citations omitted). *See also, John Wiley & Sons v. Livingston,* 376 U.S. 543, 555, 84 S.Ct. 909, 917, 11 L.Ed.2d 898 (1964) ("We see no reason why parties could not if they so chose agree to the accrual of rights during the term of an agreement and their realization after the agreement had expired.").

In determining whether bargained-for retiree benefits survive a collective bargaining agreement, this Court must "first look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Yard–Man,* 716 F.2d at 1479.[13] "Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance." *Id.* at 1480. "Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy." *Id.*

The *Yard–Man* court "emphasized two factors weighing in favor of an interpretation that retiree benefits survive expiration of the collective bargaining agreement." *Weimer v. Kurz–Kasch, Inc.,* 773 F.2d 669, 672 (6th Cir.1985). First, the court recognized that

normally retiree benefits are vested. *Yard–Man,* 716 F.2d at 1482 n. 8. This is so because retirees are unprotected in the collective bargaining process, since a union has no duty to bargain on the retirees' behalf. Therefore, retiree benefits, "once vested upon an employee's retirement, are interminable and the employer's failure to provide them [is] actionable under § 301 by the retiree." *Weimer,* 773 F.2d at 673 (quoting *Yard–Man,* 716 F.2d at 1482, n. 8). *See also, Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 393 n. 20, 30 L.Ed.2d 341 (1971); *Upholsterers' Intern. Union of North America, AFL–CIO v. American Pad & Textile Co.,* 372 F.2d 427, 428 (6th Cir.1967).

Second, *Yard–Man* recognized that retiree benefits are "status benefits" which "carry with them an inference that they continue so long as the prerequisite status is maintained." *Yard–Man,* 716 F.2d at 1482.

In *International Union, United Auto., Aerospace & Agr. Implement Workers of America v. Cadillac Malleable Iron Co., Inc.,* No. G82–75–CA1, 1982 WL 20483 (W.D.Mich., Apr. 28, 1982), the district court concluded that

> [i]n light of the inherent duration of the retirement status beyond any particular contract, the nature of retirement benefits as deferred compensation for service, and the federal policy in favor of the protection of legitimate employee expectations, it is reasonable to adopt a rule of construction which creates a presumption in favor of vested retirement benefits in the absence of clear evidence indicating a contrary intention.

*Id.* at \*8. On appeal, the Sixth Circuit found the lower court's analysis to be correct. *Intern. Union, U.A.W. v. Cadillac Malleable Iron,* 728 F.2d 807, 809 (6th Cir.1984).

The question here is whether the bargained-for retiree welfare benefits set forth

---

**13.** The court noted that "[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." *Yard–Man,* 716 F.2d at 1479 (citations omitted). Each provision of the CBA must also be interpreted "as part of the integrated whole" and, if possible, "construed

consistently with the entire document and the relative positions and purposes of the parties." *Id.* at 1479–80 (citations omitted). The terms must be "construed so as to render none nugatory and avoid illusory promises." *Id.* at 1480 (citation omitted).

in the 1988 PISA are vested, that is, whether they survive the expiration of the PISA, and are thus interminable regardless of any language found in Plan documents or administrator contracts purporting to reserve the right to terminate or modify the benefits.

■ As taught by *Yard–Man,* the Court must begin with the explicit language of the 1988 PISA for a clear manifestation of the parties' intent. The parties are in agreement as to which are the relevant provisions. However, they give diametrically opposed interpretations to these provisions.

A copy of the 1988 PISA is found at Docket No. 47, Exhibit 12. Part V, Section B contains the relevant provisions. Paragraph 14 provides:

**Employees Retired on Pension.** Employees who retire and who are eligible under the Loral Systems Group Retirement Plan for Bargaining Unit Employees for a pension (other than a deferred vested pension), shall receive the benefits described in this Section B; provided, however, that each Employee eligible under the Loral Systems Group Retirement Plan for Bargaining Unit Employees for a deferred vested pension whose employment with the Employer is terminated during or subsequent to the month in which he attained age 60 shall also receive such benefits effective as of the first day of the month for which he receives a deferred vested pension.

The particular level of benefits available to persons who retired during the term of the 1988 CBA/PISA is found by reference to Part V, Section B, "Medical Necessity Benefits Program of Hospital, Surgical, Medical and Prescription Drug Benefits for Employees and Their Dependents." [14]

Defendants Loral and ABSC do not disagree that both active employees and retir-

ees were entitled to these benefits during the three-year term of the CBA/PISA. They do, however, argue that the introduction to this Part limits the applicability only to those three years. The introduction states, in pertinent part:

Effective August 12, 1988, and for the duration of this Agreement thereafter, the Employer will provide the following Program of hospital benefits, hospital-medical benefits, surgical benefits and prescription drug benefits, subject to the Medical Necessity Review. . . .

The case law cited above would not support defendants' interpretation of this passage. Paragraph 14 clearly provides that retirees "shall receive the benefits described in this Section B." There is no time limitation placed on the benefits.

Defendants' interpretation of the contract provisions could be reworded as follows: Any employee who retires during the three-year term of the CBA/PISA is entitled to the benefits set forth in Section B, *but only until the end of that three-year term.* For a person who retires on the first day of the three-year term such interpretation at least provides three years of stability (which is still not much comfort for a retiree); but for the person who retires on the last day of the three-year term defendants' interpretation provides nothing.

Why would any Union bargaining for its members, some of whom will undoubtedly retire during the term of the contract, accept any such illusory provision? Defendants' interpretation simply defies common sense, especially in view of the undisputed fact that once an employee retires, his or her benefits are no longer bargained for. It is for this reason that *Yard–Man* and its progeny establish an inference that retiree benefits vest

---

**14.** Exhibit B of the 1988 PISA also sets forth the "Program of Major Medical Benefits." Section H, at page 171, provides that

Employees who retire and who are eligible under the Loral Systems Group Retirement Plan for Bargaining Unit Employees for a pension (other than a deferred vested pension) shall receive the Major Medical Benefits described in this Exhibit B, subject to the modification described below.

The amount of "Individual Maximums" applicable to a retired Employee or eligible dependent after the Employee's date of retirement will be the lesser of either:
(a) $60,000 or
(b) the balance of the Individual Maximum remaining to the credit of the covered individual on the Employee's date of retirement.

as of the date of retirement and cannot be changed during the lifetime of the retiree.[15]

Other provisions of the 1988 PISA support the Court's interpretation of Paragraph 14. Part V, Section B, Paragraph 15, establishing "Survivor Benefits," provides, in pertinent part:

(a) The surviving spouse of (i) a deceased Employee who retires on or after the Effective Date, and was eligible for a pension (other than a deferred vested pension), ... shall be entitled *to continue to receive the benefits of this Section B* until death or remarriage to the extent that such surviving spouse was entitled to such benefits as a dependent immediately prior to the death of such deceased former Employee, ...

(b) The benefits provided under this Section B shall continue for the spouse and dependents of an Employee who had (i) attained age 55 or more and had 10 or more years of continuous service or (ii) 25 or more years of continuous service, and who dies and at the date of death was eligible for said benefits.... Such coverage shall terminate when spouse remarries or dies; ...

If the retiree had not been expected to receive the benefits *until his or her death,* what benefits would have existed for the surviving spouses "to continue to receive"? Once again, it *defies common sense* to interpret the PISA as requiring an employee to retire *and* die within the three-year term of the contract in order for his or her survivors to be entitled to continued benefits (which, under defendants' interpretation, would still only continue until the end of the three-year term).

Part V, Section B, Paragraph 16 provides a "Special Medicare Benefit" as follows, in pertinent part:

(a) **Eligibility for Benefit.** An Employee, Pensioner or eligible Surviving Spouse, and their eligible dependents, who are eli-

gible for benefits under this Section B will be eligible for a Special Medicare Benefit upon:

(i) the Employee's retirement when retirement is after age 65,

(ii) the attainment of age 65 when retirement is prior to age 65, or

(iii) if earlier, when first eligible to enroll in Part B of Medicare with Medicare as primary coverage.

(b) **Amount of Benefit.** The amount of the Special Medicare Benefit will be equal to the standard monthly premium for Part B of Medicare....

(c) **Payment of Benefit.** ... Payment of the Special Medicare Benefit shall continue so long as the Employee, Pensioner or eligible Surviving Spouse and the eligible dependents continue to be covered for benefits under this Section B and continue to be eligible for coverage under Part B of Medicare....

Paragraph 16(a)(ii), in particular, would have no meaning under defendants' interpretation for an employee who retires at the age of 55, which is permitted. There would be no way to achieve the age of 65 within the three-year term of the CBA/PISA.

The 1988 PISA also contains a limitation on the right of the Company to change or reduce benefits. The limitation is found in Part V, Section F, Paragraph 5. It provides, in pertinent part:

... No insurance company contract which may be entered into by the Employer for the purpose of providing any benefits described in this Part V shall alter, amend or detract from the provisions of this Agreement.

The Court finds, therefore, that the 1988 CBA/PISA provided for lifetime welfare benefits, as specifically set forth in Part V, Section B and in Exhibit B to the agreement, for those employees who retired during the three-year term of the agreement. There-

---

**15.** Defendants argue that, in the past, when the benefits of active employees were improved, these improved benefits were also given to the retirees, without anyone objecting that their benefits could not be changed. They say that this shows that there was no expectation that benefits

could not change once an employee retired. This also defies common sense. Why would a retiree oppose a gratuitous *increase* of benefits? Opposition can only be expected when the employer seeks to *reduce* benefits already enjoyed and relied upon.

fore, Loral is required to maintain that level of benefits for the Coen Class and ABSC is required to maintain that level of benefits for the Hudak Class for the lifetime of each retiree and, thereafter, for the retiree's eligible survivors.

The unilateral reduction of these benefits by Loral and ABSC was a breach of the 1988 CBA/PISA. Therefore, summary judgment is entered in favor of the plaintiffs and against defendant Loral on Count I; summary judgment is also entered in favor of plaintiffs and against defendant ABSC on Count II.

### 2. Counts V and VII—Breach of ERISA Plan

■ In Count V, the Coen Class. asserts that Loral's attempt to reduce retiree benefits violates Section 502 of ERISA, 29 U.S.C. § 1132(a)(1)(B) and (a)(3); the same claim is made by the Hudak Class against ABSC in Count VII.

ERISA divides benefit plans into two classes: welfare benefits plans and pension plans. *See*, 29 U.S.C. § 1002(1) and (2)(A). The plan at issue here is a welfare benefits plan. A pension plan is subject to statutory vesting requirements, 29 U.S.C. § 1053, but a welfare benefits plan is not. *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1297 (6th Cir.1991).

In *In re White Farm Equipment Co.*, 788 F.2d 1186 (6th Cir.1986), the Sixth Circuit declined to adopt a rule that, as a matter of federal common law under ERISA, welfare benefits vest at retirement. . Rather, the court held that vesting depends upon the intention of the parties. *Id.* at 1192–93.

The *Armistead* court acknowledged. the lower court's observation that "*White Farm* [left] open the question of whether a breach of a CBA, which includes provisions for vested retirement benefits, constitutes a violation of ERISA." *Armistead*, 944 F.2d at 1298. The appeals court upheld the lower court's conclusion that "if it is the intention of the parties to confer on retirees vested rights in medical insurance benefits under a CBA, it is also their intention to confer the same rights under the 'welfare benefits plan' protected by ERISA." *Id.* The Sixth Circuit held that· "[h]aving concluded that [the defendant employer] had no right to terminate plaintiffs' insurance benefits under the CBA, we must also conclude that it had no right to terminate them when we consider the terms of the CBA as a benefits plan under ERISA." *Id.*

The same holds true here. Having determined that Loral and ABSC breached the 1988 CBA/PISA by reducing benefits which the parties intended should vest at retirement, the Court must conclude that the reduction of benefits also violated ERISA. Accordingly, summary judgment is entered in favor of plaintiffs and against Loral on Count V; summary judgment is also ·entered in favor of plaintiffs and against ABSC on Count VII.

### 3. Count IX—Whether ABSC and K & F are Alter Egos

None of the parties addressed this Count in their motions for summary judgment. There is no evidence either supporting or opposing an alter ego theory.

Therefore, summary judgment is denied on what remains of Count IX. This matter remains for trial. ·

### 4. Count X—Promissory Estoppel

Count X remains only to the extent that the individual plaintiffs, Coen and Hudak, assert claims of promissory estoppel against Loral and ABSC, respectively. It appears that this Count is pled, not as a pendent state claim, but as a Section 301 LMRA claim.[16] Therefore, it is not preempted.

The elements of estoppel are set forth in *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1217 (6th Cir.), *cert. denied*, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987) (citing *Acri v. International Ass'n of Machinists &*

---

**16.** Pendent state law claims of promissory estoppel must be dismissed as preempted by Section 301. *International Union, United Auto., Aerospace, & Agr. Implement Workers of America v. Park–Ohio Industries, Inc.*, 661 F.Supp. 1281,

1305 (N.D.Ohio 1987), *rev'd in part on other grounds*, 876 F.2d 894 (6th Cir.1989) (Text in WESTLAW) (citing *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)).

66

*Aerospace Workers,* 781 F.2d 1393, 1398 (9th Cir.1986)). Of particular relevance here is the first element: that conduct or language amounting to a representation of material facts must have been made by the party to be estopped.

Coen and Hudak assert their claims based on alleged representations made by company employees within the context of exit interviews.

The Court finds no merit in this claim. The terms of the 1988 CBA/PISA are clear and cannot be modified by anything supposedly stated by an employee of the company. In any event, in view of the judgment for the plaintiffs on Count I, II, V and VII, this Count of the complaint is virtually rendered moot and, even if prevailed upon, would provide no additional relief.

Accordingly, summary judgment is simply denied on Count X. Count X is dismissed.

## V. CONCLUSION

For the reasons set forth above, summary judgment is granted in favor of the plaintiffs and against defendant Loral on Counts I and V. Summary judgment is granted in favor of the plaintiffs and against defendant ABSC on Counts II and VII. Summary judgment is denied on Count IX; the issue of alter ego vis-a-vis ABSC and K & F remains for trial. Summary judgment is denied on Count X; however, in view of judgment for the plaintiffs on Counts I, II, V and VII, Count X is dismissed.

The issue of damages in addition to what has survived of Count IX now remain for trial. The Court will issue a separate Trial Order setting a date for the trial on these issues.

IT IS SO ORDERED.