INTERNATIONAL UNION,
UAW, et al., Plaintiffs,

v.

ALUMINUM COMPANY OF
AMERICA, Defendant.

No. 94–CV–0966.

United States District Court,
N.D. Ohio,
Eastern Division.

April 22, 1996.

Betty E. Grdina, Assoc. Gen. Counsel, International Brotherhood of Teamsters, Legal Department, Washington, DC, David E. Roloff, Goldstein & Roloff, Cleveland, OH, for plaintiffs.

Daniel A. Ward, Thomas Jeffrey Piatak, Thompson, Hine & Flory, Cleveland, OH, Thomas J. Rohbuck, Susan Wormer, LeBoeuf, Lamb, Greene & Macrae, Pittsburgh, PA, for defendant.

## MEMORANDUM OPINION

O'MALLEY, District Judge.

Plaintiffs, the International Union UAW, UAW Local 1050 and Local 808 and the class of retired workers,[1] and defendant, Aluminum Company of America ("Alcoa"), have cross-moved for summary judgment on the plaintiffs' claims. For the reasons set forth below, the defendant's motion is **GRANTED IN PART AND DENIED IN PART** and plaintiffs' motion is **GRANTED IN PART AND DENIED IN PART.**

### I. *Factual Background*

The International Union UAW and its Locals 1050 and 808 have represented the hourly employees of Alcoa's Cleveland and Vernon, California plants for many years. The Union and Alcoa were parties to a series of Collective Bargaining Agreements ("CBA"). The first of these CBAs became effective in 1977. Article XXI of the 1977 CBA listed, very specifically, the types and levels of health insurance coverage to be provided to active and retired employees of Alcoa. *See* Exhibit A to Affidavit of Ellis.

On January 1, 1979, the Employee Group Benefits Plan of Aluminum Company of America Plan II became effective. The Court will refer to this document as the "Master Plan" as it has been referred to by the plaintiffs. Article I of the Master Plan, entitled "History and Purpose," indicates that the Master Plan was enacted after Alcoa became self insured for many of the welfare benefits that it provided to its employees, both active and retired. The Master Plan states:

In order to facilitate administration of the group benefits for employees of Alcoa and certain of its subsidiaries, Alcoa adopted the plan as set forth herein, effective January 1, 1979. The plan consists of the "Master Plan II Text and the various sets of "Rules".

\* \* \* \* \* \*

*Article 2—General Provisions*

2.1 *The Text:* The Master Plan II Text (herein called the "Text") is set forth in Articles 1 through 9, and contains general provisions applicable to all Benefits payable under the Plan to Participants or beneficiaries of Participants.

2.2 *The Rules:* The various sets of Rules specify the amounts and types of Benefits provided under the Plan. Attached as Appendix I to the Text and made a part hereof is a schedule which indicates the sets of Rules included in the Plan as of January 1, 1979. Alcoa shall designate from time to time the sets of Rules and particular benefits therein in which its employees or its Subsidiaries and their employees are eligible to participate. The Text shall be applicable to any persons eligible to participate in any set of Rules.

\* \* \* \* \* \*

*Article 9—Amendments: Transfers of Assets, Etc.; Termination*

\* \* \* \* \* \*

*9.2 Amendments.* The Plan Text may be amended at any time and from time to

---

1. On March 16, 1995, this Court certified a class of retired hourly workers formerly employed by Alcoa at its Cleveland, Ohio, Vernon, California, Chicago, Illinois (prior to 1971) or Edison, New Jersey (prior to 1971) plants, pursuant to the 1988–93 UAW collective bargaining agreement or its predecessors, who were members of UAW Locals 1050, 808, 1065 or 1189, who retired prior to July 1, 1993, and who are participants in Alcoa's retiree group health care benefits.

time in whole or in part by Alcoa, or Benefits may be suspended, reduced, or terminated in whole or in part at any time by Alcoa. Additional sets of Rules may be included in the Plan, and any set of Rules may be amended at any time or deleted from the Plan, by Alcoa. Alcoa may also designate additional Subsidiaries to participate in the Text and any set(s) of Rules, and may withdraw the authorization of any Subsidiary to participate in the Text and any set(s) of Rules.

Following the effective date of the Master Plan, Alcoa and the Union again negotiated a CBA dated July 1, 1980. With respect to group insurance benefits, Article XXI of this CBA differs significantly from the 1977 agreement because it does not contain the specific memorialization of welfare benefits that appeared in Article XXI of the 1977 CBA. Instead, Article XXI of the 1980 CBA, and all subsequent CBAs, including the 1988–93 CBA, provide as follows:

The Company will provide the following coverages ... for retired employees (and eligible dependants) and surviving spouses of active and retired employees (and eligible dependants) who are receiving a pension under the Pension Agreement:

(1) for persons not eligible for Medicare: Hospital Expense, Surgical–Medical Expense and Extended Medical Expense.

(2) for persons eligible for Medicare: Supplemental Hospital Expense, Supplemental Surgical–Medical Expense and Supplemental Extended Medical Expense.

The company will also provide Life [Insurance] Coverage and Surviving Spouse Coverage for such retired employees.

All of the above benefits will be provided without cost to employees and retirees except as otherwise provided. Separate booklets describing these benefits are incorporated herein and made a part of this Agreement.

Neither the Master Plan nor the post-Master Plan CBAs set forth the specific levels of benefits to be provided. That information appears in the Summary Plan Description booklets ("SPDs"). These are the booklets that are incorporated into the CBA by reference in Article XXI.

There are four SPDs that are relevant to this Court's inquiry. Two of these were effective February 1, 1981. (Exhibits K and M to the Ellis Affidavit). Exhibit K is the February 1, 1981 SPD applicable to retired employees from "Cleveland Works" and Exhibit M is the February 1, 1981 SPD that appears to apply to all Alcoa retirees not covered by a specific SPD for their region. Exhibit L to the Ellis Affidavit is an SPD that was effective on April 1, 1981 and applies to retirees from "Vernon Works". All of these SPDs have identical provisions for hospital, surgical and medical coverage. The Vernon and Cleveland SPDs also provide for Life Insurance and Surviving Spouse coverage.

The cover of the Cleveland SPD indicates that it is referred to as "Plan II R8102C Rules"; the cover of the Vernon SPD indicates that it is referred to as "Plan II R8102D Rules"; and the cover of the general SPD indicates that it is referred to as "Plan II R8100PC Rules". All of these SPDs state that they are incorporated and made a part of "Article XXI—Group Insurance" contained in the July 1, 1980 Collective Bargaining Agreement between the UAW and Alcoa.

In addition, the Cleveland SPD includes the following statements:

"The particular benefits described in this booklet are provided effective 1981 February 01 under the R8102C Rules included in the Employees Group Benefits Plan of Aluminum Company of America, Plan II. As used in this booklet, the term 'Plan' refers to the benefits provided under the R8102C Rules. The Plan is maintained in accordance with the [Collective Bargaining] Agreement ...

\* \* \* \* \* \*

The name of the plan under which the benefits described in this booklet are provided is Employees Group Benefits Plan of Aluminum Company of America, Plan II. The Plan Administrator is Aluminum Company of America."

These same statements are made in the Vernon and general SPDs, with the appropriate

references to the Rules number designations for those SPDs being substituted.

The fourth SPD that is relevant to our analysis is the SPD applicable to prescription drug coverage. (Exhibit N to Ellis Affidavit). This SPD describes the "Optional Mail Order Prescription Drug Coverage; Summary Plan Description–Employees Group Benefits Plan Aluminum Company of America Plan I and II for Active and Retired Employees." This SPD was effective on January 1, 1984 and is an option available to any retired employee who is covered under the Employees Group Benefits Plan of Aluminum Company of America Plan I or Plan II.

### The Retiree Benefits Under the SPDs

It is undisputed that, prior to October of 1993, the SPDs provided health care coverage to retirees that included Hospital, Surgical and Medical coverage with no co-payments and no limitations on the choice of hospital or physician. Specifically, the SPDs described full first dollar coverage hospitalization and major medical benefits for persons under the age of 65, regardless of choice of physicians. The 1984 optional prescription drug SPD provided that retirees who chose this optional program would pay only a $3.00 copayment for all prescription drugs, whether name brand or generic.

### The Retiree Benefit Changes

On October 1, 1993, Alcoa announced that it was changing the terms of the optional mail order drug benefit. The co-payment increased from $3.00 to $5.00 for generic prescriptions and to $15.00 for brand-name prescriptions. In addition, the co-payment on retail prescription drugs was apparently increased.

**2.** There is no evidence in the record, such as letters or announcements to the retirees or actual amendments of the SPDs, expressly setting forth these changes. The only evidence on the record that specifically addresses the actual changes about which the plaintiffs complain is the Affidavit of Marian M. Sutton, and the attached exhibits (docket # 34), which were submitted by the Defendant Alcoa in support of its memorandum in opposition to the plaintiffs' motion to certify the retiree class. In addition, in its amended answer (docket # 38), Alcoa admitted that "on or

On January 1, 1994, Alcoa announced that pre–1993 non-Medicare retirees could join a managed care network. As with all managed care networks, the new plan required treatment by preferred member providers to obtain the maximum coverage. If the retirees did not join the managed care network, but instead chose treatment from an out-of-network provider, they would experience an increase in some of their deductibles and an 80/20 co-pay on services that were previously covered in full.[2] Thus, the plaintiffs argue that the retirees, to avoid such adverse financial consequences, were "forced" to join the managed care network.

### The Alleged Breach of the CBA

Plaintiffs argue that, by unilaterally modifying the terms of the optional mail order prescription drug program and by "forcing" the retirees to switch to a managed care network, Alcoa breached the terms of the CBA, in violation of Section 301 of the Labor Management Relations Act. (Count One of Second Amended Complaint). In addition, plaintiffs argue that this breach of the terms of the CBA also constitutes a violation of ERISA, 29 U.S.C. § 1132, (Count Two) and a breach of the defendant's fiduciary duty under ERISA, 29 U.S.C. § 1104 (Count Three). Both plaintiffs and Alcoa have moved for summary judgment on the plaintiffs' claims.

### II. The Summary Judgement Standard

Rule 56(c) of the Federal Rules of Civil Procedure dictates that, where summary judgment is sought:

The judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact

after October 1, 1993, Alcoa increased the co-payments for the mail order prescription drug program from $3.00 to $5.00 for generic prescriptions and $15.00 for brand-name prescriptions. (Answer para. 14). Alcoa also admitted "that on or after January 1, 1994, Alcoa offered retires the option of participating in a 'managed care network' known as The Emerald Network, on terms and conditions that are contained in documents provided to the retirees, and refers to those documents for their terms." (Answer para. 15.)

and that the moving party is entitled to judgment as a matter of law.

■ While all evidence must be viewed in the light most favorable to the non-moving party, summary judgment is appropriate whenever that non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "In other words, the movant [can] challenge the opposing party to 'put up or shut up' on a critical issue. After being afforded sufficient time for discovery, as required by Fed.R.Civ.P. 56(f), if the respondent [does] not 'put up', summary judgment [is] proper." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

■ In this context, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street,* at 1479–80 *citing Frito–Lay Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988). The trial court need not seek out factual disputes nor speculate on the possibility that, under some as yet unstated scenario, a meaningful factual dispute might somehow arise. The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established, which create a genuine issue of material fact. *See Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). Further, the non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some unspecified metaphysical doubt as to material facts. *Id.*

### III. *Legal Analysis*

To support their theory that Alcoa breached the terms of the CBA, as alleged in count one of the second amended complaint, plaintiffs argue that the terms of the CBA unambiguously demonstrate that the parties to the CBA intended the welfare benefits for the retirees to be "vested", lifetime benefits and that the specific terms of these benefits could never be modified. With respect to their claim that Alcoa failed to administer an employee benefits plan in accordance with ERISA, plaintiffs argue that the "plan" in this case is the CBA, thus the breach of the terms of the CBA also constitutes a violation of ERISA § 1132. Finally, plaintiffs claim that the modification of the terms of coverage for retirees breached Alcoa's fiduciary duty as plan administrator.

Defendant argues that the terms of the Master Plan expressly gives Alcoa the right unilaterally to modify, and even terminate, the retirees' welfare benefits. Defendant contends that the terms of the Master Plan are incorporated by reference into the CBA and the SPDs and must be considered when determining the parties' intentions regarding the retirees' benefits. Defendant also argues that the Master Plan, not the CBA, is the relevant employee benefits "plan" for purposes of plaintiffs' ERISA claim. Thus, any change in benefits of the retirees is expressly permitted by the terms of the Master Plan and cannot constitute a violation of ERISA § 1132. With respect to the breach of fiduciary duty claim, defendant argues that, as a matter of law, it does not act as plan administrator when it modifies the terms of the plan and is, therefore, not subject to a fiduciary duty when doing so.

### A. *Are the Retirees Entitled to "Vested" Lifetime Benefits?*

Employers typically provide two kinds of benefits to their employees: pension benefits and welfare benefits. ERISA provides for mandatory vesting of pension benefits. 29 U.S.C. § 1081; *Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1297 (6th Cir.1991). Thus, pension benefits are vested by operation of law, under ERISA.

■ Welfare benefits are benefits like health, accident and life insurance. ERISA's statutory protection is not similarly extended to welfare benefits and the Sixth Circuit has declined to adopt a common law rule under ERISA that welfare benefits vest automatically at retirement. *In re White Farm Equipment Co.,* 788 F.2d 1186 (6th Cir.1986). Thus, unless otherwise protected, the welfare benefits provided under a written employee benefit plan can be modified or even termi-

nated unilaterally by the employer. *See Musto v. American General Corp.*, 861 F.2d 897 (6th Cir.1988), *cert. den.*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989); *Boyer v. Douglas Components Corp.*, 986 F.2d 999 (6th Cir.1993).

Whether welfare benefits are "otherwise protected" requires an examination of the documents providing the welfare benefits and of the parties' intent as reflected in those documents. If the only document that memorializes the intentions of the parties is the ERISA plan itself, and the plan merely memorializes the employer's right to modify or terminate welfare benefits unilaterally, then the employer can do so at any time, for any reason. See *Musto*, 861 F.2d at 912; *Boyer*, 986 F.2d at 1005; *Gill v. Moco Thermal Industries, Inc.*, 981 F.2d 858, 860 (6th Cir.1992).

In other cases, like this one, employees are represented, and the union and the employer enter into a collective bargaining agreement. The parties to a collective bargaining agreement may provide contractually for rights which will supersede or expand upon those set out in the ERISA plan and even survive the termination of the collective bargaining agreement itself. *International Union, UAW v. Yard–Man*, 716 F.2d 1476, 1479 (6th Cir.1983), *cert. den.*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Thus, the parties to a collective bargaining agreement may "vest" welfare benefits by operation of the collective bargaining agreement. *Id.; Golden v. Kelsey–Hayes Co.*, 73 F.3d 648, 656 (6th Cir.1996). To determine whether employees' welfare benefits are "vested" by agreement, the court must determine the intent of the parties by examining the terms of the collective bargaining agreement. *Id.* As both parties agree, these issues are appropriate for summary judgment, as questions of contract interpretation are generally considered questions of law. *Golden*, 73 F.3d at 653.

## 1. *The "Yard–Man Analysis"*

The Sixth Circuit provided guidance to courts faced with the task of discerning whether the parties to a collective bargaining agreement intended to create "vested" retir-ee welfare benefits in *Yard–Man*. *Yard–Man* has been followed consistently in the Sixth Circuit and was recently reaffirmed as the definitive standard for such cases. *Golden*, 73 F.3d at 656. *Yard–Man* teaches that, while the enforcement and interpretation of collective bargaining agreements under § 301 of the LMRA is governed by substantive federal law, many of the basic principles of contract interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. 716 F.2d at 1479.

Under *Yard–Man*, the analysis begins with an examination of the "key provisions" of the collective bargaining agreement regarding retiree welfare benefits. *Id.* at 1480. If these key provisions are unambiguous regarding the rights of the retirees, the court is obviously in a position to determine the intent of the parties, as that intent is expressly set forth. If these key provisions are ambiguous as to the rights of the retirees, however, the court must look to other factors for evidence of intent, including the other provisions of the bargaining agreement and the context in which the agreement was negotiated:

> The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion ... the court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties ... As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises ... Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous ... Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other

indicia of intent for consistency with federal labor policy.

716 F.2d at 1479–80, *citations omitted.*

With respect to the context in which retiree benefits are included in the negotiations, the Court emphasized that retiree benefits are a permissive, not mandatory, subject of collective bargaining:

> As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or rewards for past services, would be left to the contingencies of future negotiations ... Further, retiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree ... Standing alone, this factor would be insufficient to find an intent to create interminable benefits ... however, this contextual factor buttresses the already sufficient evidence of such intent in the language of this agreement itself.

716 F.2d at 1482, *citations omitted.* In subsequent cases, the Sixth Circuit has clarified that this inference, which has been aptly coined the *"Yard–Man* inference", is not a legal presumption that shifts the burden of proof to the employer. *Golden,* 73 F.3d at 656. Nor does it require the court to find specific "anti-vesting" language before the court can find that the parties did not intend for the welfare benefits to vest. *Id.* Rather, it is one factor to be considered when examining the terms of the contract in order to understand the intent of the parties. *Id.*

### 2. *Yard–Man and Terms of the Alcoa CBA*

The parties to the 1988–93 CBA do not seem to dispute that the plaintiff retirees are entitled to some form of welfare benefits beyond the effective date of the CBA. Indeed, by notifying retirees of the disputed changes in their health coverage in October of 1993 and January of 1994, Alcoa effectively acknowledged that fact. *See Yard–Man,* 716 F.2d at 1481; *Golden v. Kelsey–Hayes Co.,* 845 F.Supp. 410, 414 (E.D.Mich.1994) *aff'd* 73 F.3d 648 (6th Cir.1996).

■■■ The point of dispute in this case is whether Alcoa could change unilaterally the terms of these benefits by switching to a managed care network. Plaintiffs seek a finding by this court that the retiree welfare benefits were vested in the sense that the retirees "locked in" to the level of benefits specified under the 1988–1993 CBA for life.

The plaintiff retirees all retired while the 1988–93 CBA was in effect. Plaintiffs argue that the key provisions of the 1988 CBA regarding the rights of retirees and their welfare benefits unambiguously demonstrate the parties' intention to provide "lifetime vesting" for retirees' welfare benefits. The operative words, plaintiffs claim, are "will provide." In particular, plaintiffs refer to the following phrases appearing in Article XXI of the 1988 CBA:

> "The Company ... **will provide** the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired employees ... who are receiving a pension under the Pension agreement ... all of the above benefits will **be provided** without costs to employees and retirees except as otherwise provided."

It is plaintiffs' position that these words unambiguously demonstrate that the parties intended to maintain the retirees' welfare benefits as they existed under the 1988 CBA, unchanged, for the life of the retirees. In support of this position, plaintiffs cite to cases in which, plaintiffs argue, the Sixth Circuit construed language similar to these key provisions to confer lifetime retiree benefits. Plaintiffs are correct that, in many of the cases they cite, the Court found that the key provisions were sufficient to confer lifetime benefits. In each of those cases in which the Court relied primarily upon the language of key provisions, however, those provisions were much more explicit than the key provision at issue here.[3]

---

**3.** For example, in *Policy v. Powell Pressed Steel* *Co.,* 770 F.2d 609 (6th Cir.1985), *cert. den.,* 475

In most of the cases plaintiffs cite, the key provisions were actually deemed to be ambiguous and, pursuant to the *Yard–Man* analysis, required reference to other provisions of the agreement and to the context in which the agreement was negotiated to determine the parties' intent. So, too, in this case, the key provisions of the CBA, in and of themselves, certainly do not provide an express indication of the parties' intention regarding the terms or duration of retiree benefits. Having found the key provisions of the 1988 CBA to be ambiguous, *Yard–Man* requires this Court to examine other factors to determine the parties' intent.

Plaintiffs point to other language contained in the CBA that they contend further demonstrates the parties' intent to vest retiree welfare benefits for life. Plaintiffs argue that the fact that benefits have been provided for "surviving spouses" indicates an intention to provide unchanged lifetime benefits. These benefits are described in both Article XXI of the CBA and the 1981 retiree SPDs. Plaintiffs are correct that the inclusion of surviving spouse benefits, in addition to other indicia of intent, is an indication that the parties intended to vest welfare benefits. *See International Union UAW v. Loral Corp.*, 873 F.Supp. 57, 63–64 (N.D.Ohio 1994); *Golden*, 845 F.Supp. at 413.

The specific terms of the surviving spouse coverage lends further support to this argument. The surviving spouse coverage, set forth in the 1981 SPD, includes an Adjustment Benefit Provision (applicable if the retiree dies before the age of 65), an Income Benefit Provision, and a Medical Benefits Provision. Each of these provisions contains an express time limit on the surviving spouse's right to receive benefits. For example, the "Adjustment Benefit" can be received by the surviving spouse for a maximum of 24 months after the retiree's death, the Income Benefit can be received by a

surviving spouse until the surviving spouse remarries, becomes entitled to Social Security benefits or dies. Medical Benefits are available for a surviving spouse and dependent children for a maximum of six months after the retiree's death.

In contrast, the provisions describing coverage for the retirees themselves do not limit the duration of coverage for retirees. While there are limitations on the duration of benefits available for each medical *incident*, nothing premises the right to receive general coverage on the mere passage of time. For example, for non Medicare-eligible retirees, the daily benefit for hospital confinement is limited to 120 days, the maximum period of payment for convalescent nursing home confinement is 365 days, and home health care will be provided for 100 days in a calendar year. None of these provisions, however, contains a durational limitation for overall coverage like the provisions describing surviving spouse coverage.

In a section titled "Cessation of Coverage", contained in the 1981 retiree SPDs, the SPD provides: 1) coverage for dependents ceases *when the retiree dies* or when the dependent is no longer within the definition of dependent under the Plan; 2) "the cessation of the Retired Employee's coverage shall not affect any claim incurred before such cessation"; and 3) describes what coverage is provided "if the Retired Employee or Dependent, at the date of the cessation of coverage on such Retired Employee's *account*, is totally disabled" and receives treatment. With respect to provision (1), the fact that dependent coverage expressly extends until the retirees' death is persuasive. As for provision (2), the only cessations of coverage referred to in the 1981 SPD are those limitations on coverage that apply to a specific incident requiring treatment. The incidental nature of the cessation of coverage referred to in (2) is sup-

U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986), the language in the collective bargaining agreement stated that the company would provide pensioners and their spouses with medical coverage "during the life of the pensioner at no cost to the pensioner". In *Weimer v. Kurz–Kasch Inc.*, 773 F.2d 669 (6th Cir.1985), the collective bargaining agreement provided for medical benefits to retirees "as long as such Employees remain retired and unemployed, either by the Company or by anyone else." While not cited by either party, the District Court in *Golden* found that the following language in an SPD demonstrated an intention to "vest" welfare benefits: "All of your health care coverage will be continued for the rest of your life without cost to you . . ." 845 F.Supp. at 414.

ported by the terms of provision (3), which only refers to cessations of coverage on the retired employee's *account*.

The terms of the "Cessation of Coverage" provision for retirees in the 1981 SPD stand in stark contrast to the terms of the same provision contained in the 1986 SPD for active employees. The active employee SPDs include provisions entitled "Continuance of Coverage" and "Cessation of Coverage" that set out specific durational limitations on the active employees' overall coverage, like those set forth in the surviving spouse provisions of the 1981 SPD, once employees cease to be "active employees." *See* Exhibit R to Grdina Affidavit, pp. 60–64. As discussed above, no such specific durational limitations for retiree coverage appears in the 1981 retiree SPDs.

Indeed, the Court in *Yard–Man* cited to durational limitations set for coverage for active employees, that were not applicable to retired employees, as strong evidence of the parties' intent to "vest" these benefits for retirees. *Yard–Man,* at 1481. In addition, the Court in *Yard–Man* referred to the company's actions in continuing coverage for retirees beyond the point when coverage could have been terminated for active employees as an acknowledgment by the employer of a lack of durational limits on the retirees' rights to receive welfare benefits. *Id.* Similarly, in this case, as noted above, the plaintiff class of employees retired under the 1988 agreement, yet, it is clear from the nature of this very dispute, they are considered by Alcoa to be eligible to receive welfare benefits beyond the expiration of that 1988–1993 CBA. These same factors served as the court's justification for finding that the general durational clause contained in the collective bargaining agreement did not preclude a finding that the parties intended to "vest" retirees' welfare benefits. *Id.* at 1482–83.

Plaintiffs also draw attention to the fact that the CBA and the 1981 SPDs provide different terms of coverage for retirees who are age 55 and are not eligible for Medicare and employees who are age 65 and are eligible for Medicare. Provisions are also made for a change in Medicare status, should the retiree turn 65 and change status during retirement. Alcoa permits retirement as early as age 55. *Yard–Man* found that the inclusion of such a provision indicated an intention to vest retiree benefits: "Since an employee is entitled under the collective bargaining agreement to retire at age 55, the company's promise could remain outstanding for a ten-year period. If the retiree insurance benefits were terminated at the end of the collective bargaining agreement's three year term, this promise is completely illusory for many retirees under age 62." *Id.* at 1481. In this case, such a promise would be illusory for retirees under age 65.

Another indication that the parties intended to provide coverage for life is the fact that the CBA and the SPD tie retiree and surviving spouse eligibility for coverage to eligibility for vested pension benefits. *See, Golden,* 73 F.3d at 656. Article XXI of the CBA states: "The Company will provide the following coverages . . . for retired employees . . . who are receiving a pension under the Pension Agreement. . . ." The 1981 retiree SPDs define a retiree as "a formerly hourly employee who is receiving a pension, excluding a deferred vested pension, under the Employee's Retirement Plan, and who is covered by the [CBA]".

Upon an examination of the other provisions of the 1988 CBA and the SPDs incorporated by reference, this Court finds that these provisions weigh heavily in favor of finding that the parties intended to create vested, lifetime welfare benefits for the plaintiff retirees. Couple these factors with the context in which the contractual provisions at issue were agreed to and such a finding is mandated.

### 3. The Context of the Alcoa CBAs

The context in which the CBAs between Alcoa and the plaintiff unions were negotiated also indicates that the parties intended to limit any Alcoa's right to modify the terms of coverage applicable to retirees. This context includes all of the considerations enumerated by the Sixth Circuit when it articulated the "*Yard–Man* inference." *See* pp. 1004–05 supra. In this case, an examination of context also requires an examination of the role of the Master Plan.

The parties have spent considerable time on the issue of whether the terms of the Master Plan actually were "incorporated" into the CBA. This is because, as set forth above, the Master Plan expressly provides that Alcoa can suspend, reduce or terminate benefits at any time. Defendant argues that all of the terms the Master Plan, including the amendment and modification provision, are incorporated by reference into the CBA. Plaintiffs argue that the Master Plan is inapplicable and irrelevant to the retirees' benefits.

Strangely, neither position is fully supported by the record in this case. There is no provision in the CBA incorporating, by reference or otherwise, the terms of the Master Plan into the CBA. However, plaintiffs' position that the Master Plan is in no way relevant to the benefits of the retirees cannot be seriously entertained.[4]

The SPDs expressly state that the SPDs are derived from the Master Plan. The inside covers of the 1981 SPD for Cleveland retirees reads: "The particular benefits described in this booklet are provided effective 1981 February 01 under the R8102C Rules included in the Employees Group Benefits Plan of Aluminum Company of America, Plan II. As used in this booklet, the term 'Plan' refers to the benefits provided under the R8102C Rules." Similar provisions appear in the 1981 general and Vernon retiree SPDs.

In addition, printed on pages one and two of the retiree SPDs is a message from Alcoa and its subsidiaries to the retirees. This message states: "The name of the plan under which the benefits described in this booklet are provided is Employees Group Benefits Plan of Aluminum Company of America, Plan II ... This booklet replaces all previous booklets and certificates of insurance issued to you under the Employees Group Insurance Plan and Employees Group Benefits Plan. The information in this booklet constitutes the Summary Plan Description

for the Plan required by the Employee Retirement Income Security Act of 1974."

As set forth above, the Master Plan itself states that it "consists of the Master Plan Text [Articles 1–9 of the Master Plan] and the various sets of Rules." Thus, it is clear that the SPDs are the "Rules" and are part of the Master Plan. The Master Plan clearly anticipates that its provisions, including Article 9 of the amendment provision, will be applicable to those receiving benefits described in the SPDs. As set forth above, Section 2.1 of the Master Plan states that Articles 1–9 of the Master Plan are "applicable to all benefits payable under the Plan to participants or beneficiaries of participants."

Thus, even if the terms of the Master Plan are not expressly incorporated into the CBA, it is clear that the provisions of the Master Plan were applicable, at least initially, to retiree benefits. The most relevant issue with respect to the Master Plan, however, is what happened to its provisions *after* Alcoa entered into collective bargaining over welfare benefits.

A chronological examination of the relevant documents is revealing. As described, the 1977 CBA set forth the specific levels and kinds of coverage available to employees of Alcoa. In 1979, the Company unilaterally executed the Master Plan, which recorded the respective rights of the parties as those rights are set out in ERISA, including Alcoa's' right to modify or terminate benefits that are not otherwise, by law or agreement, vested.

Significantly, after the Master Plan became effective, the 1980 CBA did not set forth specific levels of coverage as the 1977 CBA had, but instead incorporated the SPDS from the Master Plan. Thereafter, the parties engaged in permissive bargaining on the subject of retiree welfare benefits, and the retiree benefits described in the 1981 SPDs were the result.

---

4. Plaintiffs argue that because Appendix I to the Master Plan does not list the Rules designation numbers from the covers of the 1981 retiree SPDs, the terms of the Master Plan are not applicable to the retirees' benefits. The terms of the Master Plan indicates, however, that the "Rules" designations numbers listed in Appendix I are for the "Rules" in effect as of January 1, 1979. The retiree SPDs were enacted in 1981. Moreover, the Rules designation numbers for the retiree SPDs that were in effect in 1979 are listed on Appendix I.

As this Court has already found, the terms of the CBA and the SPD indicate that the parties intended to provide welfare benefits for life. Neither the 1981 SPDs, nor the terms of the CBAs contain any indication that Alcoa intended to retain the right to modify or terminate retiree benefits set forth in the Master Plan. The absence of such a modification provision in the 1981 retiree benefit SPDs can be contrasted with the provisions of the 1984 Optional Mail Order Prescription Drug Program SPD, that reserves the right to modify and terminate those benefits.

In fact, the "General Provisions" applicable to Article XXI of the post–1980 CBAs evidences an agreed limitation upon Alcoa's right to unilaterally modify the terms of coverage. Section (1) of the General Provisions provides that, in the event governmental action reduces or eliminates the premium for Medicare, "the Company shall make a corresponding reduction or elimination of the benefit payment for such Medicare premium for that person and such governmental action shall not require further modification or adjustment in this Article XXI." Thus, the parties are granting to Alcoa the right to change the terms of coverage without coming back to the CBA in those circumstances. If the unilateral modification provision in the Master Plan were fully applicable, this provision would be unnecessary.

Similarly, Section 3 provides, "unless otherwise provided in this Article XXI, the parties will meet and agree on a modification of this plan to eliminate duplication of benefits and the disposition of any savings to the Company if subsequent governmental legislation should provide any of the benefits described herein." Section 6 provides that, if the United States institutes a national health care plan, the parties will "meet and undertake a negotiated modification of the benefits under this Article XXI". These provisions set forth direct limitations upon Alcoa's right unilaterally to modify the terms of welfare benefits. This provision is contrary to any inference that Alcoa intended to preserve its right to unilaterally modify the terms of the benefits provided.

Finally, Section 5 of the General Provisions is especially relevant to the facts of this case. This provision reads: "It is recognized by the parties that qualified group practice plans may provide a more complete and satisfactory health care program depending upon an individual's personal desires ... Therefore, upon the request of either the Company or the International Union, the parties will jointly study the health care program provided by a group practice plan in any area ..." This provision goes on to express the parties' intention to seek a "mutual agreement" regarding the desirability of offering employees a choice of coverage. This provision can only be interpreted to mean that the parties intended to make any modification in coverage a mutual decision between the union and Alcoa and not a unilateral modification by Alcoa.

This Court finds that the parties to the 1988 CBA, under which the retiree plaintiffs retired, intended to provide to those retirees vested benefits, at the levels in effect at the time of their retirement, and that any modification of these benefits, except in limited express circumstances could only be made by mutual agreement. Those courts examining the issue have found consistently that the modification of existing, agreed-to terms, even when the modification does not result in a complete termination of benefits, constitutes a breach of the CBA. See *Golden*, 73 F.3d at 652, 657; *Loral*, 873 F.Supp. at 64–65. This Court agrees; Alcoa breached the terms of the 1988–1993 CBA when it modified retiree welfare benefits unilaterally. Plaintiffs' motion for summary judgment on this issue is **GRANTED**. Defendants' cross-motion is **DENIED**.

### 4. The Change in the Terms in the 1984 SPD

As described above, the introduction of the Optional Mail Order Prescription Drug Program in 1984 presented all employees and retirees with an option to coverage for prescription drugs. It did not, however, change the terms of coverage already set forth in the 1981 retiree SPDs. In addition, the 1984 SPD stated: "Alcoa expects to continue the Plan indefinitely. However, because future conditions cannot be foreseen, the Plan pro-

vides that Alcoa can amend, suspend or terminate the Plan at any time."

 The plaintiffs claim that the 1993 change to the terms of coverage under the Optional Mail Order plan breached the terms of the 1988 CBA because the 1984 SPD was incorporated by reference into the 1988 CBA. Defendant argues that the very introduction of the Optional Mail Order plan in 1984, to which the union allegedly never objected, demonstrates that Alcoa retained the right to modify all benefits under the CBA. (The parties dispute the extent to which the 1984 plan was an issue of negotiation between them.) In addition, defendant argues that, because that the 1984 SPD includes an express reservation of rights and the CBA incorporated the 1984 SPD by reference, the reservation of rights clause in the 1984 SPD became a part of the CBA and applies to all terms regarding retiree welfare benefits.

The offering of an optional vehicle for coverage, is not tantamount to a *change* in coverage, however, as long as the terms to which the parties agreed remain intact. Thus, contrary to the defendant's argument, the fact that the Optional Mail Order prescription drug plan was introduced in 1984 and was never objected to by the union is not indicative of the parties' intention to allow Alcoa to modify all terms of coverage to which the parties agreed. The terms to which the parties agreed were never modified. The reservation of rights clause contained in the 1984 SPD similarly cannot be read to demonstrate the parties' intention to reverse the negotiated limitations upon Alcoa's right to modify all terms of coverage under the CBA. At best, the reservation of rights clause in the 1984 SPD can be read to reserve the right to change the terms of the optional benefits offered in that optional plan.

The incorporation of the 1984 SPD into the 1988 CBA constituted no more than the incorporation of an option to the coverage that was already agreed upon by the parties. Alcoa reserved the right to change the terms of the option, and did so in 1993. The terms of the basic provisions for prescription drug coverage under the 1981 SPD, however, have never been changed. These are the terms that were agreed to by the parties. Accord-

ingly, this Court finds that the changes to the terms of the 1984 Optional Mail Order Prescription Drug Coverage is not a breach of the CBA. Thus, with respect to the plaintiffs' claims regarding the change to the Optional Mail Order drug plan set forth in count one of the second amended complaint, the defendant's motion for summary judgment is GRANTED and plaintiffs' motion for summary judgment is **DENIED.**

### B. *Did Alcoa Violate ERISA § 1132?*

 Plaintiffs also claim that the unilateral modification of the terms to which the parties agreed in the CBA also violated ERISA §§ 1132(a)(1)(B) and (a)(3), because Alcoa allegedly failed to administer the "plan" in accordance with its express terms. Plaintiffs adamantly assert that only the provisions contained in the CBA and the SPD constitute the employee benefit plan for purposes of ERISA. Plaintiffs claim that the Master Plan is irrelevant. Alcoa argues that the Master Plan is the benefit plan in question for purposes of plaintiffs' ERISA claim and that the Master Plan provides that Alcoa can unilaterally amend the terms of the benefits provided thereunder without violating ERISA. Again, both parties go too far with their arguments.

An examination of the plaintiffs' ERISA claim must begin with the Master Plan. This document states that it is the written memorialization, as required by ERISA, of benefits to be provided to employees. The SPDs all state that they are the summary plan descriptions of Master Plan that is required by ERISA § 1022. In addition, only the Master Plan sets forth the administrative procedures that are the "hallmark" of a "benefits plan" under ERISA. *See Swinney v. General Motors Corp.,* 46 F.3d 512, 517 (6th Cir.1995). As set forth at length above, and like most benefit plans under ERISA, the Master Plan contains a provision that allows for the unilateral modification or termination of the plan by Alcoa. Thus, if the only relevant document for ERISA purposes were the Master Plan, Alcoa's actions would not be actionable under ERISA.

 When the parties have entered into a collective bargaining agreement, how-

ever, the agreement becomes a critical part of the ERISA analysis. *Armistead,* 944 F.2d at 1298. "[I]f it is the intention of the parties to confer on retirees vested rights in medical insurance benefits under a CBA, it is also their intention to confer the same rights under the 'welfare benefit plan' protected by ERISA." *Id.* The Sixth Circuit has held that the medical insurance plan agreed to in the CBA is a welfare benefits plan under ERISA and a determination that an employer breached the terms of a CBA by amending or terminating retiree benefits that are vested under the CBA similarly breaches ERISA. *Id. Accord, Loral* at pp. 65–66.

Following *Armistead,* therefore, the terms agreed to in the 1981 SPD became a part of the retirees' employee benefit plan. As this Court has already held, Alcoa breached the CBA when it changed the terms of the vested welfare benefits for retirees by unilaterally changing to a managed care network. These benefits were vested by operation of the CBA and the unilateral modification of these benefits similarly breached the terms of the employee benefit plan in violation of ERISA. Accordingly, with respect to the change to a managed care network, the plaintiffs' motion for summary judgment on count two is **GRANTED** and defendant's motion is **DENIED.** With respect to the amendments to the 1984 Optional Mail Order Prescription Drug Plan, however, plaintiffs' motion for summary judgment is **DENIED** and defendant's motion is **GRANTED.**

### C. Did Alcoa Breach Its Fiduciary Duty Under ERISA?

 Count three of the plaintiffs' second amended complaint alleges that, as plan administrator, Alcoa breached its fiduciary duty to the plan when it "unilaterally reduced certain retiree health insurance and prescription drug coverages for retirees who retired prior to July 1, 1993" and that the modification "directly benefited Alcoa by reducing their financial obligations with respect to the Plan and [was] in direct violation of the plan terms." Defendant has moved for summary judgment on this count as well. Defendant argues that, as a matter of law, when Alcoa changed the terms of the retiree's health benefits, it was not acting in a fiduciary capacity under ERISA and, thus, could not have breached its fiduciary duty to the plan.

 Employers who are plan administrators wear two hats. On the one hand, the employer acts as an administrator when it administers the plan in accordance with its terms after the plan has been established. It is in this context that ERISA imposes upon the employer the fiduciary duty to discharge its administrative duties in the sole interest of the plan beneficiaries and participants. *See* 29 U.S.C. § 1104; *Adams v. Avondale Industries,* 905 F.2d 943 (6th Cir.), *cert. den.,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990); *Musto,* 861 F.2d 897 (6th Cir.1988).

 However, the employer also wears the hat of employer. When the employer modifies the terms of a benefit plan or terminates the plan, the employer is not acting in the role of administrator but is acting in the role of employer and, therefore, is not subject to the fiduciary standards set forth under ERISA. *Adams,* 905 F.2d at 949; *Musto,* 861 F.2d at 912. "[W]hen an employer decides to establish, amend or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards." *Musto,* 861 F.2d at 912. This principle is applicable even where the parties have contractually vested the benefits the employer seeks to change or terminate. *Helwig v. Kelsey–Hayes Co.,* 857 F.Supp. 1168, 1178 (E.D.Mich.1994).

In this case, Alcoa is correct that, as a matter of law, the role it occupied when it modified the terms of coverage for the retirees who did not elect coverage under the managed care network was that of employer, not administrator. In this role, Alcoa was not acting as a fiduciary and, therefore, the act of modification was not subject to a fiduciary duty under ERISA. Accordingly, the defendant's motion for summary judgment on count three of the plaintiffs' second amended complaint is **GRANTED.**

### CONCLUSION

For all of the foregoing reasons, plaintiffs' motion for summary judgment is **GRANTED**

IN PART AND DENIED IN PART and defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**

Accordingly, the Court declares:

1.) That the hospitalization, medical and Medicare Part B reimbursement benefits provided for in the 1988–93 CBA are vested for those employees who retired under that CBA; and

2.) That Alcoa breached the terms of the CBA when it modified the terms of the retiree welfare benefits by unilaterally implementing the managed care network health plan.

The parties are to submit briefs simultaneously within forty-five (45) days of the date of this Memorandum Opinion on the issue of the appropriate relief to be granted as a result of this Court's findings.

**IT IS SO ORDERED.**