107 F.3d 11
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE &
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, et al.,
Plaintiffs-Appellees,
v.
LORAL CORPORATION and Aircraft Braking Systems Corporation,
Defendants-Appellants.
 Nos. 95-3710, 95-3711.
 United States Court of Appeals, Sixth Circuit.
 Feb. 03, 1997.
 
 Before: KEITH, BOGGS, and COLE, Circuit Judges.
 PER CURIAM.
 
 
 1
 Loral Corporation ("Loral") and Aircraft Braking Corporation ("ABS") appeal the district court's grant of summary judgment to the plaintiffs ("Union") in this ERISA action to determine whether a collective bargaining agreement and accompanying pension plan documents gave retired workers vested pensions benefits. Loral and ABS also appeal the district court's award of attorney's fees to the Union. For the reasons that follow, we affirm both rulings.
 
 
 2
 * The dispute concerns a business in Akron, Ohio, once owned by Goodyear Aerospace Corporation ("Goodyear"). Loral purchased the business from Goodyear in 1987, and ABS (by its parent, K & F Industries) purchased the business from Loral in 1989. Both Loral and ABS assumed the employment and pension obligations of their predecessors-in-interest.
 
 
 3
 The Union represents ex-employees who retired under various versions of the collective bargaining agreement between the Union and the various employers ("CBA") and the accompanying Pension Insurance and Service Award Agreement ("Pension Plan"). The parties agreed to a CBA and a Pension Plan in 1985 and again in 1988.
 
 
 4
 In 1991, the parties could not reach agreement on a new CBA and Pension Plan. In the absence of an agreement, ABS implemented its final (rejected) bargaining proposal. This proposal included a reduction in retirement benefits for those employees who would retire after 1991. Loral and ABS continued to pay hourly employees who retired between March 12, 1987 and October 14, 1991 (the retirees at issue in this case) the full amount of health benefits provided in the 1985-88 and 1988-91 CBAs and Pension Plans.
 
 
 5
 On June 1, 1992, Loral (for retirees through 1989) and ABS (for post-1989 retirees) unilaterally reduced the health benefits of the employees who retired under the previous CBAs and Pension Plans, instituting a co-payment plan for both treatment and prescription drugs, eliminating dental coverage, and capping Medicare reimbursements. The Union then brought this action for declaratory, injunctive, and monetary relief.
 
 
 6
 After discovery, both parties moved for summary judgment. The district court granted summary judgment in favor of the plaintiffs. The court found that the relevant CBA and Pension Plan provisions, although not a model of clarity, expressed an intent that retiree health benefits vest. Accordingly, the court held that the defendants had breached the CBA and violated the terms of the Pension Plan by unilaterally decreasing these benefits. After hearing various motions concerning appropriate remedies, the court awarded the Union a permanent injunction, damages, and attorney's fees. Loral and ABS filed a timely notice of appeal.
 
 II
 
 7
 As a matter of federal law, an employer who promises to pay health benefits for the lifetime of a retired employee must keep that promise. If such a promise appears in a collective bargaining agreement, breaking the promise is breach of the collective bargaining agreement and a violation of the Labor Management Relations Act § 301(a), 29 U.S.C. § 185(a). If such a promise appears in the documents that describe the employee's pension rights, breaking that promise is a violation of the Employee Retirement Income Security Act §§ 502(a)(1)(B), (a)(3), (e) & (f), 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), (e) & (f). In most cases, because these documents typically incorporate each other by reference, breaking the promise violates both the LMRA and ERISA, giving rise to a cause of action for declaratory, injunctive, and monetary relief. The courts of our circuit have seen several such cases in recent years. E.g., Golden v. Kelsey-Hayes Co., 73 F.3d 648 (6th Cir.), cert. denied, 117 S.Ct. 49 (1996); Armistead v. Vernitron Corp., 944 F.2d 1287 (6th Cir.1991); International Union, UAW v. Aluminum Co. of Am., 152 L.R.R.M. 2297, No. 94-CV-0966, 1996 WL 343423 (N.D.Ohio Apr. 22, 1996); United Rubber, Cork, Linoleum & Plastic Workers of Am. v. Pirelli Armstrong Tire Corp., 873 F.Supp. 1093 (M.D.Tenn.1994); Hinckley v. Kelsey-Hayes Co., 866 F.Supp. 1034 (E.D.Mich.1994); Helwig v. Kelsey-Hayes Co., 857 F.Supp. 1168 (E.D.Mich.1994); International Union, UAW v. Park-Ohio Indus., Inc., 661 F.Supp. 1281 (N.D.Ohio 1987).
 
 
 8
 The primary question in each of these cases is whether the parties to the relevant agreements intended the benefits to "vest," i.e., to remain at the same level for the lifetime of the beneficiary, or whether they expected the benefits to last only as long as the particular collective bargaining agreement. ERISA law clearly allows the parties to chose either arrangement for health insurance benefits. (Certain other types of pension benefits always vest, regardless of the intentions of the parties. See Golden, 73 F.3d at 653 n. 7.)
 
 
 9
 We determine whether the parties intended for health benefits to vest by looking to the language of the collective bargaining agreement and pension plan. Unfortunately, in the vast majority of litigated cases, the relevant documentation is incomplete, vague, or ambiguous. Therefore, we also look to the context of such agreements and the contemporaneous expectations of the contracting parties. "[E]ach provision should be construed consistently with the entire document and the relative positions and purposes of the parties. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion." Golden, 73 F.3d at 654 (internal quotation omitted).
 
 
 10
 One overarching principle informs this process of reconstructing the probable intent of the parties to the CBA and plan documents. Retirees bargain in their prime when they have bargaining power for rights that they will enjoy later, in old age, when they no longer have a relationship with their employer.
 
 
 11
 [I]t is unlikely that [life and health insurance benefits], which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations.
 
 
 12
 ....
 
 
 13
 [R]etiree benefits are in a sense 'status' benefits which, as such, carry with them an inference ... that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.
 
 
 14
 International Union, UAW v. Yard-Man, Inc., 716 F.2d 1476, 1482 (6th Cir.1983) (citations omitted), cert. denied, 465 U.S. 1007 (1984). The "Yard-Man inference," as this principle has come to be called, is certainly not dispositive of a particular case. It cannot contradict the express text of the CBA or plan documents. Ibid. Nor can it, standing alone, meet the plaintiff's burden of persuasion in a case of complete ambiguity. Ibid. However, the Yard-Man inference is strong evidence of the parties' intent and should carry the day if corroborated by other proof and not convincingly contradicted.
 
 
 15
 The language of the CBA and Pension Plan at issue in this case is typically confusing. Part of the 1988 Pension Plan provides that "Employees who retire and who are eligible ... shall receive the benefits described" in the Plan. Part V, Section B, p 14. That part of the document does not mention the duration of the benefits.
 
 
 16
 Loral and ABS rely on the general introduction to that same part of the Plan.
 
 
 17
 Effective August 12, 1988, and for the duration of this Agreement thereafter, the Employer will provide the following Program of hospital benefits, hospital-medical benefits, surgical benefits and prescription drug benefits....
 
 
 18
 Part V, Introduction. The defendants contend that this general language means that they owe retirees benefits for "the duration of the Agreement," i.e., until 1991.
 
 
 19
 The district court and the Union rely chiefly on common sense. Retirement benefits that lasted for only three years (or only a few months, for someone who retired in November 1990) would be of little comfort. As the district court below wrote: "Why would any Union bargaining for its members, some of whom will undoubtedly retire during the term of the contract, accept any such illusory provision?" Opinion, April 20, 1994, at 16.
 
 
 20
 The district court also relied on two collateral provisions of the contract. The first explicitly allows surviving spouses of deceased retirees to receive a portion of the retiree's benefits "until death or remarriage." 1988 Pension Plan, Part V, Section B, p 15. The court thought it an impossible construction of the Plan to provide lifetime benefits for the surviving spouses but to terminate the underlying benefits for retirees in 1991. Opinion at 17. The second collateral provision provides for increased health benefits when a retired employee attains the age of sixty-five. The district court found this strong evidence that the parties contemplated lifetime benefits, as employees were allowed to retire as early as fifty-five under the Plan. If benefits could be reduced or eliminated at any time after the CBA expired in 1991, it could well be that there would be no health benefits to be increased by the time the retiree became 65 years of age. Opinion at 17-18.
 
 
 21
 Examining the relevant documents ourselves, we agree with the district court that the only acceptable construction of these documents is one that provides for vested retirement benefits. There is no language in the documents of sufficient clarity for us to consider the documentation "unambiguous." But there is sufficient language in the documents to corroborate the Yard-Man inference and meet the plaintiffs' burden of proof by this alternative means. Loral and ABS do offer some extrinsic evidence of a contrary contemporaneous intent by some of the parties to the bargaining process (statements by company negotiators, etc.). However, this scattered evidence of the thoughts of particular participants is too weak to justify abandoning the common sense inference of Yard-Man when that inference is supported by language in the relevant documentation.[1]
 
 
 22
 Before leaving the issue of the parties' intent at the time that the CBA and Pension Plan documents were drafted, we take a minute to address another argument by Loral and ABS. Loral and ABS contend that Yard-Man should be limited to situations where an employer completely revokes employee benefits (as did happen in that case) and that a court should presume that the parties to a retirement benefits agreement expected future changes and modifications to the vested benefits scheme. This argument cannot be reconciled with our prior case law, which has applied Yard-Man in situations where the benefits scheme has been modified by the employer, but not eliminated entirely. E.g., Golden, 73 F.3d at 648. Furthermore, if the employer retained discretion to cut benefits somewhat, there is nothing to give us a standard by which to distinguish a 1% cut from a 99% cut that would be virtually equivalent to a complete revocation. It might well be sensible for parties to agree to allow the employer to retain some flexibility to deal with future vicissitudes, but such an arrangement must be agreed to in the contract. It cannot be imposed unilaterally by the employer or the courts.
 
 III
 
 23
 We turn now to the issue of the attorney's fees awarded to the Union by the district court. A district court has broad discretion to award attorney's fees in ERISA actions. This discretion is checked by a growing federal common law of ERISA attorney's fee awards. We have identified five factors that a court should consider, none of which is dispositive or necessary: (1) culpability or bad faith; (2) ability to pay a fee award; (3) deterrent effect; (4) whether the party seeking the fees sought to confer a common benefit on the participants and beneficiaries of the Plan; and (5) the relative merits of the parties' positions. Secretary of Labor v. King, 775 F.2d 666, 669 (6th Cir.1985).
 
 
 24
 The court below did not find that the defendants had acted in bad faith. It awarded fees on the strength of the other four factors. Memorandum Opinion and Order, January 12, 1995, at 7. On the facts of the present case, we agree. The defendant is able to pay a fee award, the Union sought to confer a common benefit on all retired employees, and the Union's position on the merits of the dispute is much stronger than the defendants'.
 
 
 25
 Furthermore, we stress the peculiar vulnerability of retired employees. No longer a direct participant in the collective bargaining process that protects the interests of active employees, a retired worker has only one recourse against an ex-employer who breaches its promise to provide benefits: litigation. This litigation takes money and time--and retirees may have little of either. A self-interested employer may discover that a good deal of money can be saved by illegally withholding an amount of benefits just below the amount that would prompt its retirees, either out of outrage or fiscal interest, to sue. Since the applicable laws are complex, proving the bad faith of such employers may be difficult. But our law of attorney's fees should recognize the imbalance of power peculiar to the relationship between an employer and retired workers, and shift costs accordingly. See Armistead v. Vernitron Corp., 944 F.2d 1287, 1304 (6th Cir.1991) (attorney's fees should be awarded, regardless of good or bad faith, if an award of fees is necessary for plaintiffs and potential plaintiffs to enforce their rights under ERISA effectively).
 
 IV
 
 26
 The district court's judgments are AFFIRMED.
 
 
 
 [1]
 The defendants also claim that the prior course of dealings between their predecessor-in-interest, Goodyear, and its employees now entitles them to modify retiree health benefits unilaterally. The obvious problem with the defendants' argument is that the changes made by Goodyear were found by the district court to be favorable to the employees, a finding that the defendants dispute with telling half-heartedness. Appellants' Br. at 14-15. All that the prior practice of the employer could possibly mean is that the parties understood that the employer could unilaterally make changes with which the retirees agreed. Obviously, this understanding is of little relevance to our case now. More relevant "prior practice" is the fact that until now none of the owners of the various plants have attempted to decrease the benefits of the relevant retirees. See Appellee's Br. at 23-24; Yard-Man, 716 F.2d at 1481 (continuation of benefits after CBA expires is evidence that benefits were vested)