**Claude BOYER, Jr., et al.,
Plaintiffs–Appellees,**

**v.**

**DOUGLAS COMPONENTS CORPORATION; Universal Components Corporation; Orion Management Consultants, Defendants–Appellants.**

No. 91–2098.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 13, 1992.

Decided Feb. 18, 1993.

Rehearing and Rehearing En Banc
Denied April 6, 1993.

Kevin Preston (argued and briefed), Dresser, Marks, Svendsen, Oster & Bird, Sturgis, MI, for plaintiff-appellee.

Fred A. Ricks, Jr. (argued and briefed), McMahon, Berger, Hanna, Linihan, Cody & McCarthy, St. Louis, MO, for defendants-appellants.

Before: JONES and RYAN, Circuit Judges; and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

This action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, arises out of defendant Universal Components' attempt to terminate the health insurance benefits of the plaintiffs, a group of its retired employees or spouses of deceased retired employees. Following a bench trial, the district court issued an opinion and an order, awarding the plaintiffs damages and enjoining the defendant, Universal Components, to provide health insurance benefits to the plaintiffs.[1] The defendant appeals from this order, contending that the district court erroneously concluded that the plaintiffs' benefits had vested and that therefore the plaintiffs are entitled to relief.[2]

---

1. The corporate name of Douglas Components Corporation was changed to Universal Components Corporation on December 26, 1989. Henceforth we will refer to the former Douglas Components Corporation as Universal Components Corporation.

2. Relief was granted by the district court only against Universal Components, and the district

## I

The plaintiffs are a group of non-union retirees or surviving spouses of non-union deceased employees of Universal Components, or of Universal's predecessor, the Douglas Division of the Scott & Fetzer Company.

Douglas Division was created in 1968 when it was purchased as a going concern by the Scott & Fetzer Company. From 1968 until 1984, Douglas Division employed a group of union employees, who worked for hourly wages, and a group of non-union employees who were paid on salary. Douglas Division provided health insurance benefits for union employees, retirees and their dependents pursuant to a series of written collective bargaining agreements. Douglas Division also provided health insurance for salaried (non-union) employees, retirees and their dependents, but there was no written agreement requiring it to do so. Aetna was the health care insurer for all of the company's retirees.

The terms of the health insurance plan for the retirees during the period that Douglas Division was owned by Scott & Fetzer were set out in plan booklets provided by Aetna. A booklet, effective November 1, 1976, provided:[3] "Your Employer hopes to continue the Plan indefinitely but, as with all group plans, the Plan may be changed or discontinued." J.A. at 236.

In 1979, Aetna revised the plan booklet, and the new Aetna plan became effective on November 1, 1979. Under the heading **"Change or Discontinuance of Plan,"** the plan booklet provided: "It is hoped that this Plan will be continued indefinitely, but, as is customary in group plans, the right of change or discontinuance at any time must be reserved." J.A. at 258. With respect to retirement, the plan booklet stated:

> If you retire on or after the effective date of this part of the plan, you will continue to be eligible for medical expense coverage for yourself and your dependents under the plan to the same extent as if you had not retired.

J.A. at 255. The 1979 Aetna plan remained in effect until 1984. Some of the plaintiffs, who are retired employees or surviving spouses of now deceased employees, became entitled to benefits while one of the two Aetna plans was in effect.

In an agreement dated January 31, 1984, the Scott & Fetzer Company sold its Douglas Division to Universal Components. Universal Components continued to provide health insurance to union and non-union employees, and to union and non-union retirees who retired before February 1, 1984, as well as to employees who retired after February 1, 1984. After Universal Components purchased Douglas Division, Universal Components replaced Aetna with Blue Cross and Blue Shield of Michigan ("BCBSM") as the health care insurer.

After BCBSM became the health insurer, Universal Components distributed BCBSM plan handbooks and plan outlines to its employees and retired employees. J.A. at 566, 568–69. The BCBSM handbook describes the benefits that the employees and retirees were entitled to receive under the BCBSM plan. However, the handbook states that it is merely a guide to BCBSM benefits:

> This booklet is a guide to your Blue Cross and Blue Shield of Michigan coverage. It is not a contract or a detailed explanation of your benefits. Your contract, which is the governing instrument, contains a complete statement of benefits, limitations, terms, and exclusions.

J.A. at 386. There was no indication in the plan handbook when or whether the plan could be terminated. The outline is also silent on termination, but states:

court determined that it would not resolve any claim against Orion Management Consultants (also referred to in the briefs as "Orion Group, Inc." and "Orion Planning Group, Inc.") until this appeal has been resolved. While "The Orion Group, Inc." is named in the notice of appeal, it is clear, as stated, that the district court made no ruling as to that defendant. Since the relief granted included injunctive relief, this appeal is authorized by 28 U.S.C. § 1292(a)(1) (1988).

**3.** This is the earliest such booklet in the record and relied upon by the parties.

This is an OUTLINE of your benefits. It is not a contract. While every effort has been made to make it accurate and complete, your official benefits and conditions are contained in the Certificates and Riders listed below:

. . . . .

These documents are available on request, but they are NOT needed to obtain benefits.

J.A. at 376. The documents to which the outline and the handbook refer are a number of certificates and riders which describe the exact benefits to which the plaintiffs are entitled under the plan. A document entitled "Group Operating Agreement between Douglas Corporation [now Universal Components Corporation] and Blue Cross and Blue Shield of Michigan" ("GOA") sets out the basic terms of the contractual relationship between Universal Components and BCBSM. A "Coverage Agreement," supplementing the GOA, states which riders and certificates are in effect between the parties. The GOA provides that either Universal Components or BCBSM may terminate the contract for coverage upon thirty days' notice. There is also an addendum to the GOA entitled "Retiree Agreement" under which BCBSM agreed to provide insurance coverage to Universal Components' retirees. The Retiree Agreement provides: "This addendum may be cancelled or amended by Blue Cross and Blue Shield of Michigan following thirty (30) days written notice to the Group or cancelled by the Group following thirty (30) days written notice to Blue Cross and Blue Shield of Michigan." J.A. at 300.

In an agreement dated October 17, 1989, Universal Components sold a large part of its operation to Douglas Autotech Corporation. Universal Components began losing money soon after this sale, so on February 20, 1990, Universal Components notified BCBSM that it intended to terminate coverage for non-union retirees.[4] On April 30, 1990, the president of Universal Components sent a letter to all of the non-union retirees who retired before December 14, 1989, the effective date of the sale to Douglas Autotech, and to all spouses of deceased retirees who had so retired notifying them that their health insurance would terminate on June 1, 1990. They were told that they would have to purchase insurance at their own expense, and most of them did so.

On May 31, 1990, the plaintiffs, acting individually, filed a six-count complaint in district court seeking a temporary restraining order, monetary and declaratory relief, and other injunctive relief.[5] Three of these counts, Counts I, V, and VI survive on appeal. Count I alleges breach of an ERISA plan and seeks monetary damages. Count V requests that the defendants be enjoined from terminating health care benefits, and Count VI seeks a declaration that the defendants wrongfully terminated health care benefits and that the plaintiffs are entitled to receive benefits for the rest of their lives and the lives of their spouses.

The district court held a four-day bench trial beginning on August 13, 1991. Eight of the plaintiffs testified to conversations they had with high-level officials of Douglas Division of Scott & Fetzer and Universal Components about the duration of their health insurance, and several of these high-level officials also testified. Two of those plaintiffs, wives of deceased retirees, testified that they were told that their health insurance benefits would continue for the rest of their lives or until they remarried. Four more of the plaintiffs testified that they were told that their health insurance benefits would continue, but they also admitted that no one told them that their benefits would continue for life. The other plaintiffs did not testify. Several high-level officials testified that neither Douglas

---

**4.** In this letter, Universal Components indicted that it would only provide coverage through February, 1990. In a later dated April 18, 1990, Douglas informed BCBSM that it would extend coverage through April, and in a letter dated May 16, 1990, Universal Components stated that it would extend coverage through May. Coverage terminated on June 1, 1990.

**5.** In the original complaint, there were thirty named plaintiffs. Four of these plaintiffs have been dismissed from this law suit.

Division nor Universal Components made representations to any of the plaintiffs that benefits would continue for life, but Donald Kornstein, a plaintiff and the former president of Douglas Division, testified that he told retiring non-union employees in their exit interviews that they would have health insurance for life.

On August 30, 1991, the district court issued an opinion, containing findings of fact and conclusions of law, and an order granting the plaintiffs injunctive, declaratory, and monetary relief. As we read the district court's opinion, it determined that the written agreements between BCBSM and Universal Components did not, by their terms, control the right of Universal Components to terminate health benefits coverage of retired employees, and that therefore such right was controlled by the verbal assurances of Universal Components' officials that the retired employees had such continued rights to coverage. The court therefore concluded that because the extrinsic evidence showed that the parties intended for the non-union employees' health insurance benefits to continue after retirement, the benefits must continue. Citing a decision from this court, *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard–Man, Inc.*, 716 F.2d 1476, 1482–83 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984), the district court then also noted that benefits intended to continue into retirement are "status" benefits, and as such, give rise to an inference that the parties intended for them to last as long as the status is maintained. To overcome this inference, the district court held, the defendants must show that they unambiguously reserved the right to terminate the retirees' benefits. The district court concluded that although the Aetna plan contained such an unambiguous reservation, the BCBSM plan did not; therefore, the court concluded, the health insurance benefits had vested. J.A. at 77.

The court ordered a permanent injunction to enter requiring Universal Components to provide health insurance for the life of the retirees and their spouses, awarded the plaintiffs monetary damages for the premiums that they had been required to pay to maintain their health insurance, and declared that the plaintiffs were entitled to benefits for the rest of their lives.[6] Universal Components then filed a timely notice of appeal to this court.

## II

This court cannot reverse a district court's findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *Sandler v. AII Acquisition Corp.*, 954 F.2d 382, 385 (6th Cir.1992). However, contract interpretation is generally "a question of law not subject to the clearly erroneous standard," *Weimer v. Kurz–Kasch, Inc.*, 773 F.2d 669, 671 (6th Cir.1985); therefore, since this is a question of contract interpretation, we undertake a *de novo* review.

## III

Universal Components first points out that twenty of the plaintiffs who are allegedly entitled to benefits retired prior to February 1, 1984 while the Aetna plan was in effect; therefore, the defendant contends, any right that those plaintiffs might have to vested health insurance benefits must be found in the Aetna plan documents. The defendant then points out that since the trial court found that the Aetna plan reserved the employer's right to terminate the plan, the district court should not have admitted extrinsic evidence concerning the claims of these plaintiffs whose alleged entitlement to benefits arose while the Aetna plan was in effect. Therefore, the defendant contends, the trial court erred when it determined that the health insurance benefits of these plaintiffs were vested.

The plaintiffs respond that the district court found that the Aetna Plan documents were not relevant to this dispute (the Aetna

---

**6.** The order stated that benefits for surviving spouses would terminate when the spouses re-   married.

plan is no longer in effect because Universal Components switched health insurance carriers to BCBSM); therefore, the plaintiffs contend, the district court properly concluded that the parties' rights and obligations arise from the BCBSM plan.

Given the decision we reach below, it is not necessary for us to decide whether the district court correctly concluded that *all* of the plaintiffs' claims should be resolved under the circumstances that existed after BCBSM became the insurance provider. Therefore, we shall assume, without deciding the issue, that the district court properly adjudicated the claims of all the plaintiffs only under the post-Aetna circumstances.

## IV

■ Universal Components next contends that the district court erred when it found that Universal Components' verbal assurances require the defendant to provide the plaintiffs with vested health care insurance benefits. Universal Components contends that the BCBSM GOA and Retiree Agreement control Universal Components' right to terminate the plan and that the verbal assurances are not an oral plan requiring it to provide benefits to the plaintiffs. The defendant also argues that the district court erred when the court found that the BCBSM plan was ambiguous with respect to Universal Components' right to terminate the plan.

The plaintiffs counter that Universal Components' duty to provide health insurance benefits arises from verbal assurances by the defendant that the plaintiffs would receive health insurance benefits for life. They argue that the GOA and the Retiree Agreement control the relationship between BCBSM and Universal Components, not the relationship between Universal Components and its retired employees. Rather, the plaintiffs contend, the relationship between Universal Components and the plaintiffs is controlled by Universal Components' verbal assurances. The plaintiffs also argue that the plan documents are silent with respect to Universal Components' right to terminate the plan; therefore, they contend, extrinsic evidence was properly admitted to ascertain the parties' intent.

We hold that the BCBSM GOA and Retiree Agreement are the controlling plan documents and that any verbal assurances by Universal Components do not constitute a plan. In a recent decision, *Gill v. Moco Thermal Indus., Inc.*, 981 F.2d 858 (6th Cir.1992), this court held that the BCBSM GOA and Retiree Agreement were the controlling plan documents.[7] Guided by our decision in *Gill*, we conclude that, in the case at bar, the BCBSM GOA and Retiree Agreement are the applicable plan documents, and we reject the plaintiffs' contention that an entitlement to benefits arises from the verbal assurances that the district court found were made. *Id.* at 860.

■ We also reject the plaintiffs' contention that the plan is silent or ambiguous with respect to Universal Component's right to terminate the plan. ERISA divides employee benefits plans into two types: pension plans and welfare benefit plans. 29 U.S.C. § 1002(1), (2)(A) (1988). Pension plans[8] are subject to mandatory participation, vesting, and funding requirements;

7. It should be noted that the opinion and decision of the district judge in the instant case were cited to the district judge for the Eastern District of Michigan in *Gill*, who stated that, in his opinion, the decision in the instant case was erroneous. It should also be noted that *Gill* involved BCBSM and its GOA. This court agreed with the decision of the district judge in *Gill*.

8. ERISA defines "pension plan" as
any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organiza-

tion, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
(i) provides retirement income to employees, or
(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.
29 U.S.C. § 1002(2)(A) (1988).

however, welfare benefit plans[9] are not subject to these requirements. 29 U.S.C. §§ 1051, 1081 (1988); *In re White Farm Equip. Co. (Hansen v. White Motor Corp.)*, 788 F.2d 1186, 1193 (6th Cir.1986). A retiree health insurance benefits plan, like the one in the case at bar, is a welfare benefit plan under ERISA. 29 U.S.C. § 1002(1) (1988); *White Farm*, 788 F.2d at 1190, 1193.

■ Even though a welfare benefit plan is not subject to mandatory vesting requirements, the parties can agree to vest a welfare benefit plan. *International Resources, Inc. v. New York Life Ins. Co.*, 950 F.2d 294, 301 (6th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992); *White Farm*, 788 F.2d at 1193. To determine whether the parties have agreed to vest the welfare benefit plan, we apply principles of federal common law to ascertain the parties' intent. *Armistead v. Venitron Corp.*, 944 F.2d 1287, 1297–98 (6th Cir.1991); *White Farm*, 788 F.2d at 1192–93.

■ To ascertain the parties' intent, we first examine the plan documents. *Musto v. American Gen. Corp.*, 861 F.2d 897, 900–01 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989). The written terms of the plan documents control and cannot be modified or superceded by the employer's oral undertakings. *Id.* at 910. However, if the plan documents are ambiguous with respect to a particular term, then, under federal common law, a court may use traditional methods of contract interpretation to resolve the ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence. *See White Farm*, 788 F.2d at 1193.

Our analysis in the case at bar is informed by *Gill v. Moco Thermal Indus., Inc.*, 981 F.2d 858 (6th Cir.1992). In *Gill*,

we held that the thirty day right of termination language in the BCBSM GOA and Retiree Agreement unambiguously reserved the employer's right to terminate the plan on thirty days' notice. The same result obtains in the case at bar. The BCBSM plan handbook and outline state that the contracts and certificates contain the official benefits and conditions of the plan. The GOA and the Retiree Agreement clearly state that coverage can be terminated on thirty days' notice; therefore, we conclude that the plan may be terminated on thirty days' notice. *Id.* at 860. Since the unambiguous written provisions of a plan must control, and extrinsic evidence may not be introduced to vary the express terms of a plan, *Musto*, 861 F.2d at 901, 910, we hold that the district court erred in concluding that the plaintiffs' benefits had vested.

## V

Accordingly, we VACATE the order appealed by Universal Components Corporation and REMAND for any further proceedings not inconsistent with this opinion.

NATHANIEL R. JONES, concurring in the judgment.

I am in general agreement with the majority's opinion. Furthermore, because *Gill v. Moco Thermal Indus., Inc.*, 981 F.2d 858 (6th Cir.1992) controls the result of this case, I feel obliged to concur in the result reached in this case. I write separately to indicate that my reading of the agreements (the General Operating Agreement [GOA] and the Retiree Agreement) between Blue Cross and Blue Shield of Michigan (BCBSM) and Douglas Components Corp. (now Universal Components Corp. [Universal] ) is slightly different

---

9. ERISA defines "welfare benefit plan" as any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services....

29 U.S.C. § 1002(1) (1988).

from that of the majority of this panel and of the panel in *Gill.*

Among other things, I read the GOA and the Retiree Agreement to say the following: 1) Universal agreed with BCBSM to allow BCBSM to provide benefits to Universal's retirees; 2) retirees who are eligible will receive the benefits described therein; and 3) BCBSM or Universal can terminate the agreements upon thirty days' notice. I do not read the agreements to create an agreement between Universal and the Plaintiffs–Retirees for the provision of welfare benefits. In addition, I do not read the agreements to explicitly state when Universal can terminate any welfare benefits it may have promised its retirees, as opposed to when it can cancel this specific plan. Based on the foregoing, I would find that these agreements are silent as to when Universal can terminate any promise of benefits it may have made to the Plaintiffs–Retirees.