**Karen VALECK, Plaintiff,**

v.

**WATSON WYATT & CO., Defendant.**

No. 02–70272.

United States District Court, E.D. Michigan, Southern Division.

June 6, 2003.

---

Gary A. Benjamin, Detroit, MI, for plaintiff.

Michael J. Mills, Bloomfield Hills, MI, for defendant.

*OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE ERISA PLAN ADMINISTRATOR AND DENYING PLAINTIFF'S MOTION TO REVERSE THE PLAN ADMINISTRATOR'S DECISION*

ROSEN, District Judge.

## I. *INTRODUCTION*

This matter is before the Court on the Cross–Motions of Defendant Watson Wyatt & Company, Inc. and Plaintiff Karen Valeck requesting, respectively, affirmance and reversal of the ERISA plan administrator's decision denying Ms. Valeck's request for long-term disability benefits. Having reviewed the Plaintiff's and Defendant's briefs and the Administrative Record of this matter, the Court has determined that oral argument is not necessary. Therefore, pursuant to Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion sets forth the Court's ruling.

## II. *PERTINENT FACTS*

Plaintiff Karen Valeck is a former employee of Defendant Watson Wyatt & Company ("Watson Wyatt"), an international actuarial consulting firm headquartered in Washington, D.C., with offices in Southfield, Michigan. Ms. Valeck worked for Watson Wyatt in its Michigan office for almost 20 years, from 1981 until late 1999. For the first 15 years of her employment with Defendant, Ms. Valeck worked as an employee benefit specialist. In 1996, she was promoted to "consultant," a position she held into late 1999.

In May 1999, Ms. Valeck underwent gall bladder surgery and missed several weeks of work. Following her return to work after her surgery, Ms. Valeck experienced recurrent episodes of depression.[1] She stopped coming to work as of September 7, 1999. That day Dr. Charles Goss, Ms. Valeck's psychiatrist, wrote a letter to her employer stating that Ms. Valeck would be unable to return to work for at least two months due to a "major depressive disorder, recurrent episode." [*See* Admin. Rec., Ex. 10.] Watson Wyatt gave Ms. Valeck fully-paid time off for the next five business days through September 14, 1999. Effective the next day, September 15, 1999, Ms. Valeck applied for, and began to receive, salary-continuation benefits under Watson Wyatt's short-term disability program. Admin. Rec., Ex. 12. The short-term disability program is available to most full-time or "regular" employees. It pays an amount generally equal to two-thirds of the employee's regular salary for

---

1. The Administrative Record reveals that Ms. Valeck has a history of depression and treatment with psychiatrists and psychologists which predates her employment with Watson Wyatt and long predates her 1999 post-gall bladder surgery episodes. *See* Admin. Rec., Ex. 1.

up to 180 days. [*See* Admin. Rec., Ex. 152.]

Dr. Goss completed the "Attending Physician Statement" which he submitted on behalf of Plaintiff as part of her application for short-term disability benefits. *See* Admin. Rec., Ex. 11. In that Statement, Dr. Goss stated that Ms. Valeck "is unable to engage in stress situations or engage in interpersonal relations" and explained that the "stress" and "problems in interpersonal relations" suffered by his patient included her inability to tolerate "perceived harassment" by her supervisor, Kevin Wagner, and a co-worker, Dan Ishac. *Id.*[2]

After Plaintiff was off work for approximately six weeks, on October. 19, 1999, Dr. Goss wrote to Watson Wyatt reporting that Ms. Valeck could return to work, with restrictions, beginning November 8, 1999. The specific work restrictions outlined by Dr. Goss in his October 19, 1999 letter were as follows:

-A modified work schedule for 3 weeks—Monday, Tuesday, and Thursday—8 hours per day not to exceed 24 hours per week. After the third week, Ms. Valeck may return to full-time employment.

-Continue to receive provisions to accommodate therapy time.

-Returning to work is also conditional upon that Ms. Valeck will no longer be subject to any type of harassment by

Kevin Wagner and Dan Ishac. This will necessitate (1) the removal of Kevin Wagner as Ms. Valeck's direct supervisor and, (2) the removal of Ms. Valeck from any client team with Dan Ishac as a team member.

[Admin. Rec., Ex. 17.]

Dr. Goss further advised Watson Wyatt that if the above job accommodations could not be met, Ms. Valeck had to remain on medical leave. *Id.* Watson Wyatt, however, declined to remove Messrs. Wagner and Ishac as proposed by Dr. Goss. *Id.,* Ex. 43. In turn, Ms. Valeck declined to return to work. *Id.,* Ex. 47.

On December 5, 1999, Dr. Goss reported that Ms. Valeck remained "unable to return to work under current group management." *Id.,* Ex. 30. Watson Wyatt, therefore, considered whether Ms. Valeck qualified for a Disability Retirement under the firm's Pension Plan.[3]

*Watson Wyatt's Pension Plan and Disability Retirement*

Watson Wyatt's Pension Plan is a noncontributory pension plan that is funded through a tax-qualified trust supported by employer contributions. The Pension Plan provides a normal retirement benefit computed on the basis of the covered employee's salary and years of credited services. The normal retirement benefit is payable

---

**2.** Plaintiff subsequently explained this perceived "harassment" to Ann O'Brien, a registered nurse employed by UNUM Life Insurance Company, which provided Watson Wyatt with disability evaluation services. According to Ms. O'Brien, Plaintiff's allegations of harassment stemmed from Wagner and Ishac "talking about her" and telling her "on numerous occasions [that] she was incompetent [and] not doing [her] work." *See* Admin. Rec., Ex. 47.

**3.** Although Plaintiff has phrased her claims in this case as claims for "long-term disability

benefits," Watson Wyatt provides for long-term disability benefits only by way of a "Disability Retirement." *See* Summary Plan Description, Ex. 152, pp. 12–13. In their pleadings and supporting documents, the parties have used the terms "long-term disability benefits" and "disability retirement benefits" interchangeably. However, because the Watson Wyatt plan documents use the term "disability retirement," the Court will use this term, rather than the term "long-term disability benefits," in addressing Plaintiff's claims in this case.

in the form of an annuity at age 65. *See* Admin. Rec., Ex. 154.

Early retirement is also provided in the Plan. Participants who qualify for early retirement may elect an annuity starting at an earlier age but with monthly payments reduced to reflect the earlier benefit commencement date. *Id.* In general, early retirement is available to an employee any time after the employee's 50th birthday and completion of ten years' continued service. *Id.* Ms. Valeck did not qualify for early retirement in December 1999 because she was more than a year shy of her 50th birthday.

Watson Wyatt's Pension Plan, however, also provides for a "Disability Retirement." *See,* Ex. 154 § 6.3. Disability retirement benefit payments can begin after the maximum 180–day period for receiving short-term disability expires, and without regard to the disabled employee's age. *Id.,* § 5.3(b). The annual pension payable for disability retirement is an amount equal to no less than two-thirds of the employee's regular salary, i.e., the same benchmark used for short-term disability payments. *Id.,* § 6.3(b)(1)(B). Payments in that amount may continue until the employee reaches age 65, when normal retirement payments commence.

An employee qualifies for a Disability Retirement under the Pension Plan if, among other things, the employee's "continuous service is terminated by disability." *Id.* "Continuous service" is defined to include most regular payroll periods, including leaves of absence, but excludes "periods following when an Employee quits, is discharged or retires during which he receives some form of compensation from the Company...." *Id.* § 2.11. Further, the Pension Plan defines "total disability" and "totally disabled" to mean that

> ... because of injury or sickness (sickness means injury or disease):

(1) an Employee cannot perform each of the material duties of his regular occupation; and

(2) after disability pension benefits have been paid for 30 months, the Employee cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education or experience.

[Watson Wyatt Pension Plan, Admin. Rec., Ex. 154, § 5.3(b)(i).]

The Summary Plan Description of the Watson Wyatt Plan (the "SPD") defines "total disability" slightly differently. The SPD provides that an employee is "totally disabled"

> if, as a result of illness, disease, or accidental injury, you are not working and:
>
> ● for your first 30 months of disability benefits, you are unable to perform any of the duties of your *regular job* and
>
> ● after your first 30 months of disability benefits, you continue to be unable to perform any of the material duties for which you would reasonably be expected to perform based on your education, training and experience.

[Summary Plan Description, Admin. Rec., Ex. 155, p. 14 (emphasis added).]

The SPD, however, expressly provides that "If there are any differences between this SPD and the plan document, the plan document will govern." *Id.* p. 3.

### ADMINISTRATION OF WATSON WYATT'S PENSION PLAN

Watson Wyatt itself serves as the Pension Plan's administrator. Ex. 154, § 3.1. The company discharges its plan administrator functions through a Retirement Committee appointed by the company's President. *Id.* The Pension Plan gives the Retirement Committee the power "to utilize discretionary authority to construe the

terms of the Plan and Trust" and "to determine all questions arising in the administration of the Plan, including those relating to the eligibility of persons to participate. . . ." *Id.*, §§ 3.1(c), (d).

The Plan provisions further authorize the Retirement Committee to engage such advisors "as may be desirable in the administration of the Plan." *Id.* § 3.1(g). Consistent with that authority, Wyatt engaged UNUM Life Insurance Company of America (UNUM) to provide the company with disability evaluation services. Ex. 4, 21. UNUM does not underwrite or insure the Pension Plan's benefit obligations in any way. *See* Ex. 155.

*EVALUATION OF PLAINTIFF VA-LECK'S CONDITION AND CAPACI-TIES*

At Wyatt's request, UNUM began to evaluate Ms. Valeck's condition and capacities in late 1999. *Id.* In February 2000, UNUM sought detailed information from Ms. Valeck's treating psychiatrist, Dr. Charles Goss, D.O., and from her psychotherapist, Ms. Sandra Johnson, ACSW. In response to an inquiry as to Ms. Valeck's then current work restrictions and limitations, Dr. Goss reported that Ms. Valeck

> cannot return to her *exact* former position due to her severe anxiety (related [to] her supervisor) with subsequent worsening of her depressive and obsessive compulsive symptoms. She also reports persecutory ideations regarding Kevin Wagner and Dan Ishac.

Admin. Rec., Ex. 75.

> Ms. Johnson reported that Ms. Valeck would like to resume her career, but cannot under current/previous conditions of experiencing harassment by her manager. . . . This harassment situation triggers her PTSD issues.

Admin. Rec., Ex. 76.

In response to UNUM's specific questions concerning Ms. Valeck's ability to work, although Dr. Goss stated that it was "undetermined at this time" whether Ms. Valeck would be able to return to her job as an actuarial consultant at a different employer, he did affirmatively state that "Ms. Valeck could return to her job with the restrictions cited 10–19–99 [i.e., a different supervisor and associate team worker] in place." Ex. 75. Sandra Johnson, Ms. Valeck's psychotherapist, similarly stated that

> Karen could return to work *if* she had a new manager and was not dependant [sic] upon current manager (Kevin) or associate Dan in anyway.

Ex. 76.

UNUM subsequently asked one of its psychiatric consultants, Dr. Robert W. Buchanon, M.D., to review Ms. Valeck's file and analyze the additional information provided by Dr. Goss and Ms. Johnson. After reviewing the information, Dr. Buchanon noted that Both Dr. Goss's and Ms. Johnson's statements "certainly do imply that if claimant were doing her occupation in another work setting she would be able to return to work and do it." Admin. Rec., Ex. 89. However, because Dr. Goss's statement that it was "undetermined at this time" given response to the specific question of whether Ms. Valeck could return to her job as an actuarial consultant with a different employer appeared to Dr. Buchanon to be inconsistent with his previous statement that Ms. Valeck could return to her job with the October 19, 1999 work restrictions in place, Dr. Buchanon called Dr. Goss for clarification.

Dr. Buchanon asked Dr. Goss why he had answered "undetermined" in response to the question as to whether Ms. Valeck was able to do her occupation with a different employer. Dr. Goss responded that he answered that way because it would de-

pend on the work setting. Admin. Rec., Ex. 89. Dr. Goss explained hat he thought that the claimant could do her work as an actuarial analyst for a different employer, adding that the work setting would have to be one in which Ms. Valeck did not feel harassed by management or supervisors and one that she perceived to be a safe place to work. *Id.*

Based upon his follow-up conversation with Dr. Goss, Dr. Buchanon opined that he believed that Ms. Valeck's "current limitations are more job versus occ[upation] than limitations from a psychiatric illness at this point in time," and that he considered any such medical/psychiatric limitations to be mild. *Id.*

Thereafter, UNUM requested and obtained a labor market survey for the Detroit area. The survey identified seven area firms that employ benefit consultants like Ms. Valeck, and noted that a number of those of the firms had then current or anticipated job openings. Admin. Rec., Ex. 117.

### THE DECISION REGARDING MS. VALECK'S ELIGIBILITY FOR DISABILITY RETIREMENT

Based upon the medical information provided to Dr. Buchanon and UNUM by Ms. Valeck's psychiatrist and therapist, UNUM concluded that issues specific to Ms. Valeck's job environment, not her psychiatric condition, were preventing her from returning to work. UNUM explained to Watson Wyatt's Retirement Committee:

> The medical information from Dr. Goss and Ms. Johnson clearly indicates that Ms. Valeck is capable of returning to her occupation as an Actuarial Consultant at a different employer provided that she felt she was a safe [environment] and free harassment....
>
> ... [I]ssues specific to Ms. Valeck's job are preventing her from returning to

work. However, she is able to perform the material duties of her occupation as an Actuarial Consultant/Compliance Consultant.

> Based on the results of our investigation, we recommend that Watson Wyatt deny Ms. Valeck's application for long term disability benefits because she does not meet the definition of "Total Disability or Totally Disabled."

Admin. Rec., Ex. 105.

The Retirement Committee accepted UNUM's recommendation to deny Ms. Valeck's application for Disability Retirement benefits and the Plan Administrator notified Ms. Valeck of that decision by letter on April 7, 2000. *See* Ex. 116. The Administrator's letter further informed Ms. Valeck of her right to seek review of the denial of her claim within 60 days. *Id.*

On April 19, 2000, Ms. Valeck submitted her request for a review of the denial of her application for long-term disability benefits under the Watson Wyatt Pension Plan. The basis of Ms. Valeck's request for a review is what she perceived to be a discrepancy between the Pension Plan language which uses the term "regular occupation" and the SPD language which uses the phrase "regular job" in its place. Ms. Valeck argued that the SPD language meant her specific job in her then Watson Wyatt job setting and that this interpretation should control. She did not argue in seeking administrative review, nor does she now argue, that anyone at Watson Wyatt gave her this interpretation; rather this was her own subjective interpretation of the language. *See* Ex. 120.

Watson Wyatt's Retirement Committee considered Ms. Valeck's argument. In so doing, the Committee considered a "position paper" that UNUM had provided the company outlining the purpose of an occu-

pation-based disability test which explained, in pertinent part, as follows:

> The Long Term Disability insurance sold to our policyholders is intended to provide a benefit when employees are unable, due to injury or illness, to perform the material duties of their occupation. . . .
>
> Our contracts are designed to protect insured workers from the inability to perform their own occupation, not the individual peculiarities of their job or the specific requirements of the work place where they perform it. The best example of this, would be a school teacher who works in a building which occasionally is exposed to fumes from a nearby industrial plant and develops a disabling allergy to them. Since industrial fumes are not found in most teaching situations, the claimant is disabled for that job and not her occupation of teaching. On the other hand, if that same teacher were to develop an allergy to chalk dust, the claim would be payable since chalk dust is an inherent part of the teaching profession. The same logic can be applied to stress claims as a result of "personality conflicts" or environmental issues.

[Admin. Rec. Ex. 69, pp. KV0110, 0112.]

The Retirement Committee also requested that UNUM conduct a *de novo* review of Ms. Valeck's disability application and requested that a second review be conducted by a UNUM representative that was not involved in the initial review process. *See* Ex. 135. UNUM also sought an independent review of the relevant legal issues by outside legal counsel. *Id.*

UNUM conducted a second review, using as its standard this time, Ms. Valeck's "job" interpretation as opposed to the "occupation" interpretation it applied in its previous analysis of the claim. UNUM advised Watson Wyatt that, assuming that Ms. Valeck is correct in her interpretation of the definition of "regular job," she would be "totally disabled" under the terms of Watson Wyatt's plan. *Id.* On the other hand, UNUM advised that if Ms. Valeck is incorrect in her interpretation, she would not be considered "totally disabled" under the plan. *Id.*

As indicated, the Committee also obtained a legal review of Ms. Valeck's perceived conflict between the terms "regular job" and "regular occupation" in the SPD and full Plan document. The legal opinion relied upon by the Committee noted no Sixth Circuit authority concluding either that the terms "job" and "occupation" have different or conflicting meanings or that the terms mean the same thing. *Id.* The opinion further noted that in the Sixth Circuit, the SPD would govern if there were a conflict with the terms of the plan itself, but only if the two documents were in direct conflict and only if it were established that it was reasonable for the employee to have relied upon the SPD language. *Id.*

The Retirement Committee fully considered all of the foregoing and a special telephonic meeting was convened to discuss Ms. Valeck's appeal. *See* Ex. 137. The Committee members ultimately concluded that there was no conflict in the provisions of the SPD and the Plan, noting their belief that the word "job" was used in the SPD as a substitution for the word "occupation" in an effort to include language in the SPD that would be more easily understood by a participant in the plan. *Id.* The members also found that no reliance existed in Ms. Valeck's case. *Id.*

Based upon the foregoing, the Committee decided to affirm its denial of Ms. Valeck's claim for a Disability Retirement, and notified her of the decision by letter dated June 19, 2000. *See* Ex. 138.

Meanwhile, while Watson Wyatt was evaluating Plaintiff's eligibility for a Disability Retirement, the company continued to pay Ms. Valeck two-thirds of her salary pursuant to its short-term disability program. The 180–day period governing that program expired in April 2000. Normally, Watson Wyatt would remove an employee from its payroll if he or she did not return to work upon the expiration of that period. In Plaintiff's case, however, Watson Wyatt and Ms. Valeck negotiated and entered into a separate agreement entitled "General Release of Claims and Settlement Agreement," which was executed in August 2000, i.e., after the company affirmed its denial of her claim for long-term/disability retirement benefits. *See* Ex. 139. Under this Agreement, Watson Wyatt agreed to pay specified severance payments to Ms. Valeck in a way that was designed to enable her to qualify for early retirement under the company's Pension Plan, even though Plaintiff was leaving Watson Wyatt's employ before her 50th birthday.

Specifically, the August 2000 Agreement provided that Watson Wyatt would make monthly severance payments of $6,250.00 per month to Ms. Valeck from July through December 2000, and a final payment of $18,750.00 in January 2001, for a total salary severance amount of $56,250.00. *Id.* The Agreement further called for the payment to Ms. Valeck of $10,000.00 in October 2000 in lieu of a fiscal year bonus, and also provided for the company's payment of Ms. Valeck's CO-BRA premiums for medical and dental coverage through December 31, 2000, and the payment of her basic life insurance premiums through that date, as well. *Id.* The Agreement further specified that Ms. Valeck would "not report to work during this [July through December 2000] period" and that Ms. Valeck agreed "not to seek or accept employment with [Wyatt] or its af-

filiated companies or to visit [Wyatt's] offices." *Id.* Pursuant to the Agreement, Ms. Valeck agreed to retire from Watson Wyatt effective December 31, 2000, by which time she would be 50 years old and qualify for regular early retirement under the Watson Wyatt Plan. *Id.*

In return, Ms. Valeck agreed to release and discharge Watson Wyatt

> from any and all claims, demands, actions, causes of action, suits, liabilities, interest, attorneys' fees, damages or costs of any nature.
>
> By way of further example, but not limitation, VALECK releases WATSON WYATT from any and all claims pursuant to any state or federal statutes or common law including, but not limited to, the civil rights and equal opportunity laws of the United States (including the Age Discrimination in Employment Act), Michigan and any other state, any other state or federal laws, and the constitution of any state and of the United States, and hereby expressly waives any and all legal or equitable remedies which may have been or are currently available to her thereunder including, but not limited to, any claim for attorneys' fees.

*Id.*

The Agreement, however, contained an express exclusion from this waiver of rights:

> This Agreement does not release any worker's compensation claim that VA-LECK may have *or any claim she may have in the future pursuant to ERISA relating specifically to WATSON WYATT's denial of her application for long-term disability benefits.*

*Id.* (Emphasis added.)

Two months after executing this Agreement, however, on October 11, 2000, Ms. Valeck submitted a retirement application form indicating that she was "reapplying"

for a disability pension, seeking pension payments commencing as of June 2000. Ms. Valeck stated that on this new application that her new application for disability retirement benefits was "based on Dr. Charles Goss' medical evaluation commencing in June 2000 due to emotional circumstances with respect to Watson Wyatt in June 2000." *See* Ex. 140. The Watson Wyatt Retirement Committee denied Plaintiff's application on December 12, 2000. In its denial letter, Watson Wyatt's Plan Administrator explained to Ms. Valeck that "the Plan... does not include a reapplication provision. In the absence of such a provision, Watson Wyatt cannot accept or process your reapplication for long-term disability benefits." Ex. 143.

On January 9, 2001, Plaintiff wrote to Watson Wyatt's Plan Administrator clarifying that her October 2000 application was really not a reapplication for benefits based upon her previously-claimed condition, but rather was a *new* claim, based upon her *current* condition that existed since June 2000. *See* Plaintiff's 1/9/01 letter to Watson Wyatt's Plan Administrator, Ex. 145. Plaintiff emphasized in this letter, "My claim for LTD is a new one." *Id.* p. 4. She further stated that because this was a fresh claim based upon her inability to perform any work at all, there were no "job versus occupation" issues in her new claim as there were with respect to her previous claim. *Id.* p. 2. Plaintiff also submitted in support of her new application a one-sentence note from her psychiatrist, Dr. Goss, dated December 21, 2000, which stated, "This is to verify that Karen Valeck has been totally disabled from any type of gainful employment since June, 2000." Ex. 144.

The Retirement Committee reviewed this supplemental information but did not change its decision. On March 20, 2001, the Committee notified Plaintiff in writing of its adherence to its previous denial of the October 2000 application:

> After carefully reviewing your request and the terms of the Plan, the Committee has determined that it cannot grant your request for long-term disability benefits because the administrative record regarding this claim for benefits was properly closed in June 2000. In accordance with ERISA, the Plan allows one level of appeal when benefits are denied, and in your case, this remedy was exhausted in June 2000. The Plan does not provide for or require the second level of appeal that you are now seeking, and, therefore, we cannot accept new information with respect to your claim.

[Admin. Rec. Ex. 148.]

Plaintiff subsequently initiated this action seeking reversal of both of the Retirement Committee's decisions denying (1) her original claim and appeal for disability retirement benefits and (2) her second application in October 2000 for disability benefits.

## III. DISCUSSION

### A. STANDARD AND SCOPE OF JUDICIAL REVIEW IN ERISA CASES

The Supreme Court has ruled that the standard of review in ERISA cases is *de novo* unless the benefit plan gives the plan administrator discretion to determine eligibility for benefits or to construe plan terms:

> As this case aptly demonstrates, the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue. Consistent with established principles of trust law, we hold that a denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). *See also, Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 616 (6th Cir.1998).

■ Here, Defendant Watson Wyatt's Pension Plan document expressly provides that the company's Retirement Committee is responsible for administration of the Plan and that the Committee has "discretionary authority to construe the terms of the Plan... and ... to determine all questions arising in the administration of the Plan, including those relating to the eligibility of person to participate; [and] the rights of Employees, former Employees and Beneficiaries...." *See* Admin. Rec. Ex. 154, p. 13.

The above-quoted language from the Plan makes clear that Watson Wyatt's Retirement Committee has been granted complete discretion to determine eligibility for benefits under the Plan. Therefore, Watson Wyatt is entitled to an "arbitrary and capricious" standard of review by this Court in reviewing the decision to deny Plaintiff's claim for disability retirement benefits.

Under an arbitrary and capricious standard of review, the Court is called upon to determine whether the Defendant's decision to deny the Plaintiff benefits was rational and consistent with terms of the policy. *Miller v. Metropolitan Life Insurance Co.,* 925 F.2d 979, 984 (6th Cir.1991); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir.1996). Stated otherwise, "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Finance Cos. Retire-*

*ment Plan,* 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990).

### B.  WATSON WYATT DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN DENYING PLAINTIFF'S SEPTEMBER 1999 CLAIM FOR DISABILITY RETIREMENT BENEFITS

■ As indicated above, under an arbitrary and capricious standard of review, the Court is called upon to determine whether the Defendant's decision to deny Plaintiff benefits was rational and consistent with terms of the policy. *Miller v. Metropolitan Life, supra.*

At issue with respect to Plaintiff's September 1999 application for Disability Retirement benefits is whether the language of the SPD—"regular job"—or of the language in the plan itself—"regular occupation"—used by Watson Wyatt in defining "total disability" are in conflict. Ms. Valeck argues that the term "regular job" is narrower than "regular occupation" and means the specific job in the specific office and with the specific supervisor and co-workers with whom she worked, not just the kind of work she did, which she contends would define her "occupation." She does not claim that anyone at Watson Wyatt ever told her that the two words "job" and "occupation" should be interpreted this way; rather this is merely her own subjective interpretation of the two words. And, because the SPD uses the word "job" while the Plan document itself uses the word "occupation," based upon the distinction between the two words that she herself has drawn, Plaintiff argues that the SPD and Plan document are inconsistent. Therefore, she argues that the Court is required to use the "regular job" language of the SPD and construe that phrase as she does. In support, Plaintiff

relies on *Edwards v. State Farm Mutual Automobile Insurance Company*, 851 F.2d 134 (6th Cir.1988).

In *Edwards*, the Sixth Circuit held that when the summary plan description and the plan document contain conflicting language, the SPD controls. *Id.* at 136. In the *Edwards* case, the court enforced the terms of the summary description where such terms directly contradicted those in the plan and where the plaintiff had received only the summary description, and not the plan document. The court remarked that "it is of no effect to publish and distribute a plan summary booklet designed to simplify and explain the plan ..., and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet." 851 F.2d at 136 (quoting *McKnight v. Southern Life & Health Ins. Co.*, 758 F.2d 1566, 1570 (11th Cir.1985)).

■ However, application of the *Edwards* rule requires more than showing of inconsistency of terms. Rather, to trigger application of *Edwards*, the SPD and the Plan document must **directly conflict**. *Edwards*, 851 F.2d at 136. In this case, the SPD and the Plan document do not directly conflict. At best, what can be said of the alleged "inconsistent" usage of terms is that the term "job" as used in the SPD is ambiguous, and it is well-settled that "language in a plan summary that is merely ambiguous should not be permitted to trump unambiguous language in the plan itself." *Foltice v. Guardsman Products, Inc.*, 98 F.3d 933, 938 (6th Cir.1996). *See also, Boyer v. Douglas Components Corp.*, 986 F.2d 999 (6 th Cir.1993) (the court is required to give effect to the unambiguous terms of the plan).

Furthermore, even if the Plan language did not control, since the Plan and the SPD definitions of disability are both rea-

sonable, under an arbitrary or capricious standard, the court must defer to the plan administrator's interpretation that is rational in light of the plan's provisions. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996). Watson Wyatt's plan administrator reasonably determined that Ms. Valeck was not disabled because the undisputed medical evidence of record showed that while she could not work with two specific individuals, she could continue her same job as an employee benefits professional under different circumstances. Ms. Valeck was not prevented from working generally, nor was she even prevented from continuing to work as an employee benefit consultant. The only prohibition was her continuing to work under the specific management in place within her department at Watson Wyatt.

The clear import of the "total disability" provisions of both the Plan document and the SPD is that an employee cannot work because of a "disability." It was not irrational or unreasonable for the plan administrator here to find no total disability where the only problem Plaintiff had with working was working with two specific individuals.

Application of *Edwards* is further uncalled for in this case because unlike the plaintiff in *Edwards*, Plaintiff here has not claimed that she only received the SPD and relied on its explanation of benefits in the absence of receiving the Plan document itself. Indeed, the Court finds that any attempt on the part of Ms. Valeck to argue reliance on the SPD would be particularly *un* reasonable because Ms. Valeck's area of expertise was employee benefits and, as Plaintiff herself admitted in seeking reconsideration of the denial of her claim for benefits, because of her position as an employee benefits consultant, she was "very familiar" with language used

in Watson Wyatt's Plan and SPD, and in particular, the provision in the SPD that "[if] there are any differences between the SPD and the plan document, the plan document controls." *See* Admin. Rec., Ex. 120, p. 2.

Based upon the foregoing, the Court finds that Defendant Watson Wyatt did not act arbitrarily or capriciously in denying Plaintiff's September 1999 application for Disability Retirement benefits. Wyatt's denial of Ms. Valeck's claim was reasonable and supported by applicable case law.

### C. DEFENDANT DID NOT ACT ARBITRARILY OR CAPRICIOUSLY IN DENYING PLAINTIFF'S OCTOBER 2000 CLAIM FOR BENEFITS

As indicated above, Ms. Valeck submitted a second application for disability retirement in October 2000 which she emphatically claims is not a renewal or request for reconsideration of the denial of her first claim for long-term disability benefits but rather is a new claim, based upon her condition after June 2000, and not based upon her condition as it was presented in connection with her September 1999 claim.

■ Although not addressed by the parties, to the extent that Plaintiff's claim in this case is predicated upon an entirely new claim for benefits, it appears to the Court that any such claim is barred by the terms of the "General Release of Claims and Settlement Agreement," which was executed in August 2000. The Release and Settlement Agreement specifically bars "all claims made by her or that could have been made by her against WATSON WYATT" as of August 16, 2000, i.e., the date on which Plaintiff executed that Agreement, except her claim "pursuant to ERISA relating to WATSON WYATT's denial of her application for long-term dis-

ability benefits." [*See* Ex. 139, ¶¶ 2, 6.] The only claim for long-term disability benefits which had been denied by Watson Wyatt at the time that the General Release of Claims and Settlement Agreement was executed was the denial of Plaintiff's 1999 claim. Plaintiff had not yet filed any claim based upon her June 2000 condition. This second claim, based upon Plaintiff's condition since June 2000, is therefore, not excluded from the coverage of the Release and Settlement Agreement. As indicated, the Release and Settlement Agreement covers "all claims made by [Plaintiff] *or that could have been made by her* against Watson Wyatt." [*See* Ex. 139, ¶ 6.]

■ Considering Plaintiff's October 2000 claim on the merits, Watson Wyatt's decision to deny Plaintiff's application must be deferred to by this Court if it was reasonable. Watson Wyatt's decision relies on the pension plan language which states that disability retirement is available to employees whose "continuous service is terminated by disability." *See* Admin. Rec., Ex. 154. As Ms. Valeck stopped working in September, 1999, her total disability of June 2000 could not have terminated her "continuous service" to Wyatt.

The Sixth Circuit made clear in *Moriarity v. United Tech. Corp. Represented Employees Retirement Plan*, 158 F.3d 157, 161 (2nd Cir.1998), that an individual can ordinarily terminate service with his or her employer only once. Consequently, if the termination did not qualify for disability retirement benefits, the terminated employee cannot earn after he or she stops working greater benefits that may have been available through disability retirement. As the court found in *Moriarity,*

> An average plan participant... could not credibly come away believing that, if

he left [work] and was subsequently found disabled, he was entitled to a lifetime's worth of long-term disability benefits from [his former employer]. Although we are not required to do so, we would strain to avoid such a preposterous result.

*Id.*

Thus, Wyatt's decision in this case to deny Plaintiff's October 2000 claim for long term disability benefits was reasonable.

## IV. CONCLUSION

For all of the forgoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion to Affirm the Decision of the Plan Administrator is GRANTED and Plaintiff's Motion to Reverse the Plan Administrator's Decision is DENIED. Accordingly,

IT IS FURTHER ORDERED that Plaintiff's Complaint be, and hereby is, DISMISSED in its entirety with prejudice.